478 So.2d 724 (1985)
Mary Elizabeth SHARP and Oakes W. Sharp, Plaintiffs-Appellees,
v.
METROPOLITAN PROPERTY AND LIABILITY INSURANCE COMPANY and United Service Automobile Association, Defendants-Appellees.
No. 84-803.
Court of Appeal of Louisiana, Third Circuit.
November 7, 1985.
Peters & Hennigan, Lloyd E. Hennigan, Jr., Jena, for plaintiffs-appellees.
Stafford, Stewart & Potter, Russell L. Potter, Alexandria, for defendants-appellants.
McLure and McLure, John G. McLure, Alexandria, for defendant-appellee.
J.P. Mauffray, Jr., Jena, for intervenor-appellee.
Before GUIDRY, STOKER and KING, JJ.
STOKER, Judge.
Mrs. Mary Elizabeth Sharp was a guest passenger in a vehicle involved in a two-car accident in LaSalle Parish. She suffered various injuries in the collision. Mrs. Sharp and her husband, Oakes Sharp, sued Mrs. Mary Gray, driver of the other vehicle, Metropolitan Property and Liability Insurance Company (Metropolitan), Mary Gray's insurer, and United Services Automobile Association (USAA), the underinsured motorist insurer of Mrs. Johnnie Dietle, Mrs. Sharp's host driver. Jim Nick Gray, Mary Gray's husband, intervened on behalf of his minor daughter, Cathy, who was a passenger in the Grays' car, alleging *725 that Mrs. Dietle caused the accident and claiming damages for Cathy's broken arm. USAA filed a third party demand against Mrs. Gray and Metropolitan.[1]
After trial on the merits the jury found Mrs. Gray 100% responsible for the accident. It awarded Mrs. Sharp $55,000 for general damages and Mr. Sharp $10,000 for loss of consortium. The Sharps also were awarded $15,510.30 for special damages. Jim Nick Gray's intervention was denied by the jury, but the judge granted an additur of $2,500 for Cathy Gray's damages. USAA was awarded $3,900 on its third party demand representing the amount it had paid the Dietles for the loss of their car.
Mary Gray has appealed, claiming that the jury erred in finding her 100% at fault in the accident and that the general damages awarded to Mr. and Mrs. Sharp were manifestly erroneous and clearly excessive. We affirm the judgment of the trial court.

FACTS
The accident occurred on January 30, 1983 shortly before 5:00 p.m. south of Jena. Louisiana Highway 8 intersects with Louisiana Highway 3104 at less than a 90 degree angle. Just to the east of that intersection is a short turn-off lane which connects the two highways and forms a triangular neutral ground. On Highway 8 across from the triangle is the Airport Grocery.
Mrs. Johnnie Dietle was driving her green 1978 Chevrolet Caprice from Jena toward Pollock on Highway 8 in a westerly direction. Mrs. Mary Elizabeth Sharp was a passenger in that car. Mrs. Mary Gray had taken her 15-year-old daughter Cathy to the Airport Grocery to buy school supplies. She was driving a white 1975 Chevrolet. Mrs. Gray exited the parking lot of the Airport Grocery and cut across Highway 8. She intended to enter the turn-off lane to get on Highway 3104. In the process Mrs. Dietle and Mrs. Gray collided. The point of impact is disputed. After the collision Mrs. Gray's car ended up on the triangular median and Mrs. Dietle's car came to a rest on the corner of the median where the turning lane meets Highway 3104. Mrs. Sharp, Mrs. Dietle and Cathy Gray were taken by ambulance to LaSalle General Hospital. Mrs. Dietle evidently suffered very minor injuries which required no further treatment. Mrs. Sharp and Cathy Gray were transferred to Rapides General Hospital. Cathy's broken arm was set and she was released. Mrs. Sharp's injuries, including a crushed larynx and a broken leg, required hospitalization.

LIABILITY
Mrs. Gray argues that the jury erred in finding Mrs. Dietle free from fault in the accident. She claims that Mrs. Dietle was negligent in failing to keep a proper lookout, which was at least partly the cause of the collision. She cites Spencer v. Hynes, 452 So.2d 1291 (La.App. 3d Cir.1984) for the proposition that the driver of the preferred vehicle may be held contributorily negligent when she could have avoided a collision by maintaining a proper lookout and exercising ordinary care. We note that Spencer involves an intersectional collision and the rights of drivers were established by LSA-R.S. 32:123. That section deals with the entry onto a preferential thoroughfare from an intersecting roadway posted with a stop or yield sign. The present case involves LSA-R.S. 32:124, which directs a driver who attempts to enter or cross a highway from a private road or driveway to stop and yield the right of way to all approaching vehicles so close as to constitute an immediate hazard. In Hardee v. St. Paul Fire & Marine Ins. Co., 445 So.2d 771, 774 (La.App. 3d Cir. 1984), this Court said:
"In interpreting this statute, our courts have repeatedly held a driver entering a *726 highway from a private driveway has a primary or high duty to avoid a collision. This duty becomes more onerous as the hazards increase and requires a motorist to use every reasonable means available to ascertain his entry onto the highway may be made in safety. West v. Ryder Truck Lines, Inc., 218 So.2d 106 (La. App. 3rd Cir.1969), writ den. [254 La. 130], 222 So.2d 882 (La.1969)."
Nevertheless, there are circumstances in which the driver with the right of way may be held liable in a collision with a vehicle entering the highway. For instance, in Zager v. Allstate Insurance Co., 211 So.2d 744 (La.App. 3d Cir.1968), Mr. Zager left a shopping center parking lot and turned left onto a road. He had traveled 60 or 70 feet before being struck from behind by Mr. Maggio. The court found Mr. Maggio negligent because he was at least 333 feet from Mr. Zager's car when he first saw it, yet did nothing to prevent the collision. In Johnston v. Bituminous Casualty Corp., 169 So.2d 726 (La.App. 2d Cir.1964), the plaintiff pulled out of his driveway after observing that no cars were approaching in either direction. Approximately 90 feet down the road the defendant ran into the rear of the plaintiff's truck. The court determined that defendant was not keeping a proper lookout and that he could have avoided the accident if he had been more attentive.
In the case before us, Mrs. Sharp and Mrs. Gray tell two different stories. They place the site of the actual impact in different locations. Each produced testimony and evidence to support her account. The jury accepted Mrs. Sharp's version and held Mrs. Gray 100% responsible for the accident. Only if we conclude that the trier of fact was clearly wrong or manifestly erroneous can we disturb its finding of fact.
Mrs. Dietle testified that she was proceeding along Highway 8 at 45 miles per hour when Mrs. Gray unexpectedly pulled out of the Airport Grocery parking lot in front of her. Mrs. Dietle claims that she slammed on her brakes but that the cars were just too close to avoid the collision. State Trooper Jimmy Odom, who prepared the accident report, placed the collision site in Mrs. Dietle's lane of traffic. Mrs. Gray stated that she first saw the Dietle car some distance away and believed that she had sufficient time to cross the highway. However, she had traveled only a short distance into the road before the cars collided. There was no allegation that Mrs. Dietle was speeding.
Mrs. Gray places the point of impact in the turn-off lane. She supports her assertion with the testimony of firemen who were called in to clean the debris and leaking fluid from the road. Photographs show that the area they hosed down was in the turn-off lane. In order to have collided at that point Mrs. Dietle would have had to have left Highway 8 and crossed a ditch. No tire marks were left in the ditch.
Mrs. Sharp countered by producing evidence that the firemen had no experience in accident reconstruction, that they were told to hose down a particular area, and that they did not look for debris on Highway 8. Trooper Jimmy Odom made specific observations to determine how the accident occurred. Based on the damage to the cars and the location of the wreckage, he reported that the accident occurred in the westbound lane of Highway 8. He issued a ticket to Mrs. Mary Gray for failure to yield.
Though Mrs. Dietle does not remember that the cars collided twice, Mrs. Gray's testimony that they did is not inconsistent with Mrs. Dietle's version of the accident. The deflection of the cars at the first impact could have positioned them for a second collision, which might account for the location of the Dietle vehicle extending into Highway 3104.
The jury considered all of the evidence before it. It weighed the credibility of the witnesses. We find ample evidence to support its finding that Mrs. Gray was the sole cause of the accident. We therefore affirm this part of the verdict.

*727 MRS. SHARP'S DAMAGES
Mary Gray contests Mrs. Sharp's award of $55,000 for general damages. The Supreme Court in Reck v. Stevens, 373 So.2d 498 (La.1979), stated that an appellate court may not disturb an award made by the trial court without a finding of clear abuse of discretion.
Examination of the testimony and evidence adduced at trial convinces us that the jury did not err in setting Mrs. Sharp's general damages at $55,000. At the scene of the accident Mrs. Sharp could not remember any part of her body hitting the interior of the car but felt that something was wrong with her neck. She experienced difficulty in breathing and could not talk. Mrs. Dietle testified that Mrs. Sharp could not swallow and made choking sounds. She was rushed by ambulance to LaSalle General Hospital. LaSalle evidently did not have the facilities to treat her, so she was transferred to Rapides General Hospital. There she was seen by Dr. James T. Pate. Dr. Pate noted that Mrs. Sharp had trouble breathing, had some bruises and abrasions on her neck, and had an injury to her right leg. An emergency tracheotomy was performed which helped her to breathe. Two days later she was anesthetized and underwent a laryngoscopy to allow Dr. Pate to assess the damage to her neck. He found a laceration of the hypopharynx and a great deal of swelling and hemorrhaging. The same procedure was performed several days later after the swelling had decreased. Dr. Pate could see that the right side of her voice box was crushed.
Mrs. Sharp was then sent by ambulance to Ochsner Clinic in New Orleans. Yet another laryngoscopy was done. Hospital records indicate that Mrs. Sharp was upset because she "didn't know what was going to happen." At that point she was unsure whether she would ever be able to speak again. Mrs. Sharp was returned to Rapides General Hospital after five days. She was on an IV until the following day to prevent dehydration. She was finally released on February 16, over two weeks after the accident. During her stay in the hospital she received Demerol, Morphine, and Tylenol 3 with codeine continuously to relieve pain. Dr. Pate testified that these medications are not given unless they are necessary, and both Mr. and Mrs. Sharp testified that they were indeed necessary. Mrs. Sharp stated that she "hurt all the time." Some of the pain relievers were given by shot in the hip, which was quite unpleasant.
Mrs. Sharp also had a persistent lowgrade fever due to a mild infection of the superficial mucous membrane. The tracheotomy tube was still in place when Mrs. Sharp was released. It had to be cleaned daily which required removing the tube and replacing it with one that had been cleaned with hydrogen peroxide and water. When mucous built up around the tube it caused a rattling noise when Mrs. Sharp breathed. The removal and replacement of the tube was painful and often caused bleeding. Mrs. Sharp was also required to use a humidifier to keep her lungs from drying out. While the tube was in place, coughing was impossible, so Mrs. Sharp's lungs had to be suctioned to remove mucous. This caused discomfort and a gagging reaction. The tube was removed for cleaning in the beginning of March, 1983 and could not be replaced. Dr. Pate allowed her to leave the tube out and the incision healed naturally. Mrs. Sharp was left with a fairly unobtrusive scar.
Though Mrs. Sharp could make sounds by placing her finger over the tracheotomy opening, she effectively could not speak during the time the tube was in place. Mrs. Dietle testified that she and Mrs. Sharp communicated by writing on a slate. After the tube was removed she had a very hoarse, whispery voice. She still cannot yell and cannot talk loudly enough to give presentations to the various organizations of which she is a member. She was restricted in the foods she could eat and lost at least some interest in eating in general. Her weight fell from about 150 to 122 pounds, and she was described at trial as being frail. Dr. Pate testified that Mrs. *728 Sharp's voice "will never be absolutely perfectly normal." He also stated that it might even worsen due to scarring.
Mrs. Sharp's right leg was also broken in the accident. Initially it was set in a plaster cast extending from her hip to her foot. Later a short cast was applied from the knee down. For approximately six weeks Mrs. Sharp could not walk. She was treated by Dr. Banks who prescribed painkillers to relieve her discomfort. After the cast was removed, Mrs. Sharp used a walker for one month. Although she can now get around she said her knee bothers her all of the time. She finds it difficult to stand or sit for over an hour and props her leg up as much as possible. Both her husband and Mrs. Dietle testified that the leg swells and she still favors her left leg.
Mrs. Sharp formerly was a very active woman. Though she has apparently made an impressive recovery for a woman of 66, we feel that an award of $55,000 was within the jury's discretion in light of the pain that she endured during her recuperation and the residual effects she suffers. Mrs. Sharp did not complain of the amount awarded, so we are concerned only with a question of excessiveness of the award. Therefore, we affirm this part of the award.

MR. SHARP'S DAMAGES
Mr. Oakes Sharp claimed damages for loss of consortium as provided in a 1982 Amendment to LSA-C.C. art. 2315. That article states in Paragraph B that:
"Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person."
We recognize a need to distinguish between loss of consortium, service and society, and the mental anguish suffered by an uninjured third party. The latter is not compensable. Definitions of these terms in a maritime context may be found in Gaspard v. Transworld Drilling Co., 468 So.2d 692, 693 (La.App. 3d Cir.1985):
"Society includes the familiar loss of consortium element, but is broader, as it also includes the general love, companionship, and affection that the spouse and other family members lose as a result of a maritime injury or death. * * * `Services' is a monetary award designed to replace the uncompensated work, guidance, and upkeep that the injured or deceased party formerly performed for the family (household maintenance, educational help for children, etc.), which ostensibly will, as a result of the injury or death, now have to be obtained from another source and at a price."
Though "society" subsumes "loss of consortium" in this definition, we believe that the compensable elements under Article 2315 and under Gaspard are the same.
The evidence shows that Mr. Sharp was deprived of the consortium, service and society of his wife during her recuperation. She was hospitalized for sixteen days. For two weeks after that, she wore a tracheotomy tube. For six weeks after her release she wore a leg cast. She used a walker for a month after the cast was removed. Undoubtedly, Mrs. Sharp was unable to function sexually for at least part of this time. Mr. Sharp was required to do all of the cooking and housework during this time. He still cooks, though he testified that he does so because "I don't have anything else specially to do." The pain in Mrs. Sharp's leg still restricts her ability to do the housework. Mr. Sharp said that permanent changes have occurred in their relationship.
Only one case involving the loss of consortium under Article 2315 has reached the appellate level in this State. In Harrington v. City of Abbeville, 471 So.2d 1160 (La.App. 3d Cir.1985), this court affirmed an award of $7,500 to the wife of a pedestrian who tripped on an exposed reinforcement rod of a curb. The wife testified that because of his back and neck pain her husband had become difficult to live with and also that he could not function sexually. After noting that the trial court had no *729 guidance in making the award because the cause of action was newly created, we stated that we found no abuse of the trial court's discretion.
Other states have more experience in awarding damages for the loss of consortium. We have found recent awards ranging from $2,500 in Malone & Hyde, Inc. v. Hobrecht, 685 S.W.2d 739 (Tex.App. 4 Dist. 1985), (to the wife of a diabetic who died one month after injecting himself with too much insulin due to the negligence of his doctor and his pharmacy), to $100,000 in Burke v. U.S., 605 F.Supp. 981 (Md.1985), (to the husband of a cancer victim who required more extensive treatment because of an improper diagnosis by her doctor).
Considering the nature of Mrs. Sharp's injuries, we cannot say that the award of $10,000 to Mr. Sharp was outside of the acceptable range.

CONCLUSION
As we find no manifest error in the assessment of liability or the awards of damages to the Sharps, we affirm the judgment of the trial court at appellants' costs.
AFFIRMED.
NOTES
[1] USAA filed a separate suit asserting this same claim which was consolidated with this suit and which bears our docket number 84-804 and is entitled United States Automobile Association v. Metropolitan Property & Liability Insurance Company. We render a separate opinion in this case at 478 So.2d 729 (1985).