499 So.2d 1095 (1986)
Layton N. MILLER, et al., Plaintiffs-Appellees,
v.
ATLANTIC RICHFIELD COMPANY, et al., Defendants-Appellants.
No. 85-1078.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1986.
Writ Denied December 5, 1986.
*1096 Scofield, Bergstedt, Gerard, Mount & Veron, P.C., J. Michael Veron, Lake Charles, for defendant-appellant.
Jones, Jones & Alexander, J.B. Jones, Jr., for appellant.
Cameron, Davidson, Meaux, Sonnier & McElligott, J.J. Davidson, III, Lafayette, for defendant-appellee.
Before DOMENGEAUX, GUIDRY and YELVERTON, JJ.
YELVERTON, Judge.
Layton Miller and his wife and children filed suit against Atlantic Richfield Company, Arco Oil and Gas Corporation, and their insurer, Insurance Company of North America, along with Power Rig Drilling Company (Power Rig), alleging that Miller was injured due to the negligence of defendants' employees. From a jury verdict finding Arco 75 percent at fault and Power Rig 25 percent at fault and awarding Layton Miller $363,450 for damages and his wife $3,000 for loss of consortium, the defendants have appealed. We affirm.

FACTS
On June 16, 1984, the plaintiff, Layton Miller, was injured at a Cameron Parish oil rig owned by Arco. Power Rig was under a contract with Arco to drill and work the well which Arco subsequently decided to plug and abandon. The plug and abandon procedure required the cutting of the wellhead assembly from the casing, the removal of the assembly, and the welding of a sheet of metal over the open casing at a certain depth. The procedure required the services of a welder. Arco and Power Rig did not employ welders, but contracted for their services. Arco in the present case contracted with Oil Patch Welders for the services of Layton Miller as needed. Miller with his two sons owned the business of Oil Patch Welders.
To cut the wellhead assembly from the casing Miller was required to go down in an area called the "cellar", a six-foot-square hole lined with boards. After the *1097 cut Miller got out of the cellar and a cable was attached to the wellhead assembly and to an air hoist. Mark Derouen, Arco's drilling engineer, instructed the air hoist operator to lift the wellhead assembly. The attempt was unsuccessful, so the cable had to be slacked to allow the plaintiff to safely return to the cellar. Miller made additional cuts and again got out of the cellar. After another unsuccessful attempt to lift the assembly, the line was slacked and the plaintiff once more returned to the cellar with a sledgehammer to knock the assembly loose from the casing. While plaintiff was in the cellar this time, Derouen gave a hand signal to the air hoist operator to lift the assembly. At this point the wellhead popped loose injuring Miller.
Plaintiffs filed suit in tort against the defendants. The case was tried by a jury. At the close of plaintiffs' case Arco moved for a directed verdict urging that the evidence showed Layton Miller was an employee of Arco at the time of the accident and that his exclusive remedy was for worker's compensation benefits. The motion was denied. The defendants objected to the testimony of Miller's expert on economics, but that objection was overruled. They then moved for a directed verdict to exclude the claim for loss of future earnings. That motion was likewise denied.
The jury returned a verdict for plaintiffs finding Arco 75 percent at fault in causing the accident and Power Rig 25 percent at fault. It awarded plaintiff $8,450 in medical expenses, $10,000 for pain and suffering, $20,000 for past lost earnings, and $325,000 for future lost earnings. The jury also awarded Mrs. Miller $3,000 for loss of consortium.
Arco and Power Rig appealed the judgment entered pursuant to the jury verdict.
The issues raised on appeal are as follows:
1) Whether the trial court erred in denying Arco's motion for a directed verdict as to plaintiff's suit in tort;
2) Whether the trial court erred in allowing the testimony of Donald Cornwell, the plaintiffs' expert on economics, and whether the trial court erred in denying defendants' motion for a directed verdict to exclude Layton Miller's claim for loss of future earnings;
3) Whether the jury's verdict regarding plaintiff's loss of future earnings was supported by the evidence;
4) Whether the trial court erred by allowing Arco's insurance policy to be shown to the jury;
5) Whether the evidence supported an award to Mrs. Miller for loss of consortium.

THE STATUTORY EMPLOYMENT DEFENSE
Arco, relying on Vizena v. Travelers Ins. Co., 238 So.2d 238 (La.App. 3rd Cir.1970), writ denied 239 So.2d 542 (La.1970), argues that under the provisions of R.S. 23:1021(6) of the Worker's Compensation Act Layton Miller should be treated as an employee of Arco, and that therefore his exclusive remedy against Arco is for worker's compensation benefits.
Vizena involved an independent contractor welder, who was killed while repairing a salt water tank for an oil and gas refinery. The court held that since he spent a substantial part of his work time in manual labor doing work that was an integral part of the refinery's trade, business, and occupation, his exclusive remedy was under the compensation law. In the recent case of Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), Vizena was cited as an example of an expansive "integral relation" test that was initially in use by the courts of this state. The court in Berry explained that the integral relation test of Vizena has now been abandoned in favor of the more restrictive method of analysis announced in Berry and Rowe v. Northwestern National Ins. Co., 471 So.2d 226 (La.1985). In deciding the present case we will accordingly apply the precepts of Berry and Rowe rather than the holding of Vizena.
For an independent contractor to be covered under the worker's compensation law, *1098 he must show not only that he spent a substantial part of the work time in manual labor carrying out the contract, but also that he performed services "arising out of and incidental to his employment in the course of his employer's trade, business or occupation." LSA-R.S. 23:1021(6); R.S. 23:1035; Lushute v. Diesi, 354 So.2d 179 (La.1978); Brown v. State Farm Fire & Casualty Company, 407 So.2d 1251 (La. App. 3rd Cir.1981); 13 W. Malone & H. Johnson, La. Civil Law Treatise  Worker's Compensation, § 78 (1980). In the present case there can be little doubt that a substantial part of Miller's work was manual labor. But there remains the question of whether his contract work was a part of the trade, business, or occupation of Arco. For this the test of Berry v. Holston Well Service, Inc., supra, is applicable.
One rule explained in Berry is that if it is determined that the contract work is specialized per se, the work is not a part of the principal's trade, business or occupation as a matter of law. That court said that whether the contract work is specialized is a question of fact, requiring considerations of whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. In Berry, the contract work was wireline service  work which the court held was specialized per se. The principal in that case had no employees of its own who could do wireline work and had always contracted out that type of work to those entities with the skill and equipment to handle the job properly. The principal in that case had contracted with the wireline company to do the necessary perforating work in an oil well workover operation.
In the present case Layton Miller was a welder. He and his two sons performed general oilfield welding for Arco and other companies. Welding requires training and experience and equipment generally not possessed by persons outside the welding field. The Millers owned and provided their own equipment. Arco contracted with Oil Patch to perform the cutting necessary on a "plug and abandon" operation. Arco did not employ any welders and had always contracted out that type of work. Arco's representative testified that it contracted with persons such as Layton Miller because Miller knew how to cut a proper line. It is clear from the evidence that Arco did not have the employees or equipment capable of performing the necessary welding.
Considering the facts as proved in the present case, this is a "specialty" case. Welding is a specialized occupation requiring a degree of training, experience, skill and equipment not normally found outside the welding field. For these reasons the contract work in the present case was not a part of Arco's trade, business or occupation.
The only defense raised by the defendants which was addressed to Miller's status was that Arco was his statutory employer. The plea of "statutory employer" under the provisions of Section 1061 is an affirmative defense and the burden of proof is upon the party asserting it. Berry v. Holston Well Service, Inc., supra. Arco did not meet its burden.
The additional argument presented on this appeal was that Miller was both the worker and the contractor and that, as such, he could pursue a claim in damages against Arco only if he was an independent contractor as defined by R.S. 23:1021(6). Relying solely on the exception contained in this definition, appellants urge that if a substantial part of his work time is spent in manual labor, an independent contractor is covered by the compensation act and the principal is insulated from tort liability. It is argued that Miller was an independent contractor because he was not an employee of a contractor and one cannot be an employee of himself, citing Flint v. Rockwood Ins. Co., 455 So.2d 1251 (La.App. 4th Cir. 1984) and Carney v. Liberty Mutual Ins. Co., 277 So.2d 175 (La.App. 3rd Cir.1973). From this Arco argues its tort immunity.
The implication of this argument is that an independent contractor seeking compensation benefits need only make the manual *1099 labor showing to qualify for such benefits, and that somehow the connection between his work and the employer's occupation is not necessary. The argument overlooks R.S. 23:1035 which requires that the independent contractor seeking compensation benefits demonstrate that he is performing services arising out of and incidental to his employment in the course of his employer's trade, business or occupation. Although he is an independent contractor and not an employee of the principal, he is treated as an employee for compensation purposes and for that reason must make this showing just as an employee would have to do. Therefore, it makes no difference in the present case whether Miller was working for himself or was working for the partnership composed of himself and his two sons. The contract work he was performing was specialized per se. It was not a part of Arco's trade, business or occupation, Miller was not covered under the compensation act, and he could pursue a tort remedy against Arco.

THE TESTIMONY OF CORNWELL AND PLAINTIFF'S CLAIM FOR LOSS OF FUTURE EARNINGS
The defendants argue that the plaintiffs failed to lay a proper medical foundation for economic testimony regarding lost future wages, and therefore the trial court erred in allowing the expert Donald Cornwell to testify and in denying defendants' motion for a directed verdict to exclude plaintiff's claim for loss of future wages. Defendants contend that the medical testimony failed to show that the injury caused an impairment which would result in a reduction or loss in Layton Miller's earning capacity. We find no error.
Dr. Thomas Ford, an orthopedic surgeon and Miller's treating physician, testified Layton Miller suffered a fracture at the left femoral neck in the left hip as a result of the accident. The fracture created a clean break and was displaced. Surgery was performed and several pins were driven in the bone for fixation. He was hospitalized for this and several months later he was again hospitalized for the removal of the pins.
About a year before this accident, plaintiff had an ileostomy or removal of the colon. An ostomy was made on the right side. Miller's rectum was later removed. All of this caused some difficulty in the accomplishment of his work, but he had adapted; despite the permanent ostomy and the inability to put the weight on his right side, he had learned to do his work by putting the weight on his left side. The left leg was the one affected by the present accident.
Dr. Ford stated that, while he knew of no anatomical reason why Layton Miller could not go back to work, he was not acquainted with the various duties of welders and did not know whether Miller could actually return to that work. He opined that Miller could stand in one place and weld. He said he would not be surprised if the plaintiff could not lift objects weighing 75 pounds or more. According to the doctor, Miller suffered a physical impairment as a result of the accident expressed as a decreased ability to move his hip out, or to externally rotate the hip, a 10 percent permanent partial impairment to his lower extremity, and a 4 percent impairment to his body as a whole. Dr. Ford testified that it was subjective as to the degree of pain a person can tolerate, that every sort of disability determination has to be personalized to the patient to some extent, and that he would defer to Mr. Miller as to what he could do and what he could not do.
Dr. Ford was the only medical witness to testify in the case.
The evidence reveals that a welder's duties require heavy manual labor. Mr. Miller testified that a welder is required to do heavy lifting like oxygen bottles weighing 100 to 125 pounds, acetylene bottles weighing 150 to 160 pounds, and sheets of metal. He testified that he could no longer perform his duties as a welder due to his inability to lift heavy objects. Due to his permanent ostomy it was necessary that a bag be attached at all times on his right side. Before this accident he had to lift *1100 objects with his left side. Since the fracture of his left femur he has not been able to endure weight on his left side as he did before the accident, making it even more difficult to lift weight.
In Bize v. Boyer, 408 So.2d 1309 (La. 1982) the Supreme Court stated as follows:
"In order to obtain an award for impaired earning capacity (or future loss of wages) and for future medical expenses, a claimant must present medical evidence which at least indicates there could be a residual disability causally related to the accident. Lay testimony simply serves to complement and corroborate the medical evidence...."
In the present case the medical testimony showed that plaintiff suffered a physical impairment as a result of the accident, and that he would not be able to lift heavy objects. The lay testimony established that welders have to lift heavy objects routinely. We find that plaintiff laid a sufficient foundation for the admission of evidence concerning loss of future earnings. Therefore, the trial court did not err in allowing the testimony of Donald Cornwell or in denying the defendants' motion for a directed verdict to exclude plaintiff's claim for loss of future earning capacity.

LOSS OF FUTURE EARNINGS
Defendants argue that the jury's award of lost future wages was not supported by the evidence. We disagree.
Donald Cornwell, an assistant professor of economics and finance, testified for plaintiff. Layton Miller was 46.73 years old at the time of the accident. He had a work life expectancy of 14.71 more years. After analyzing Miller's past tax returns, the expert opined that Miller had suffered a minimum loss of $435,141.02 in future wages if he was never able to work again. However, he testified that if plaintiff went back to teaching welding at the time of the trial, plaintiff would suffer a minimum loss of $116,985 in future wages, but that the loss could be as much as $570,000. These figures did not take into account many of the benefits that plaintiff had been receiving in addition to his wages.
Plaintiff testified that he could teach welding in the future, but that he would no longer be able to perform his duties as a welder in oilfield welding. Considering these facts the jury's verdict was supported by the evidence.

THE INSURANCE POLICY
Defendants also contend that the trial court erred in disclosing Arco's insurance policy limits to the jury. We find it unnecessary to address the state of the law on the subject of whether disclosing policy limits to juries is now forbidden, because in any event such disclosure in the present case did no harm and was, in fact, justified.
Over Arco's objection the jury was allowed to see its two million dollar insurance policy. However, the jury's award fell well below the policy limits and the award did not constitute an abuse of discretion. In fact the jury awarded Layton Miller only $10,000 for pain and suffering. This award was on the low side. His award of $20,000 for loss of past wages was also on the low side considering the evidence. The award for loss of future earnings was in the mid range of the jury's discretion.
The trial court in its charges to the jury carefully explained how it was to go about determining damages, and cautioned it not to be influenced by the fact that there was insurance. It is obvious from the award that the jury followed those instructions and that it was not influenced by the amount of the coverage.
Actually, it is possible that showing this policy to the jury was necessary for clarification purposes. The reason is that the Insurance Company of North America, the insurer of Arco for the liability coverage of two million dollars, happened also to be the worker's compensation insurer of Oil Patch Welders, the plaintiff's partnership with his two sons. The facts relating to this latter coverage were brought out before the jury *1101 both on direct and cross examination of the plaintiff himself.

LOSS OF CONSORTIUM
Defendants argue that no evidence was presented to support the jury verdict awarding Mrs. Miller $3,000 for loss of consortium. We disagree.
The evidence reveals that Mrs. Miller was deprived of the consortium and the services of her husband during his recuperation. He was hospitalized for six days initially. He had to use a walker, crutches or a cane for months after the accident. Mrs. Miller testified that he continues to be unable to perform all of his regular chores around the home and their farm. In the similar case of Sharp v. Metropolitan Property and Liability Insurance Company, 478 So.2d 724 (La.App. 3rd Cir.1985) this court awarded the victim $10,000 for loss of consortium. In the present case we find the evidence is sufficient to sustain the jury's award.
For the above reasons the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.