644 So.2d 402 (1994)
John M. RUDD, et ux, Plaintiffs-Appellees,
v.
ATLAS PROCESSING REFINERY, et al., Defendant-Appellant.
No. 26048-CA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1994.
Writ Denied December 16, 1994.
*403 Smitherman, Lunn, Chastain & Hill by W. James Hill, III, Donald Lee Brice, Jr. and Michael E. Powell, III, Shreveport, for appellant, Atlas Processing Co.
Patricia N. Miramon, Shreveport, for appellees, John and Willie Russ.
Cook, Yancey, King & Galloway by Timothy B. Burnham, Shreveport, for appellee, Federated Mut. Ins. Co.
Before MARVIN, C.J., NORRIS, J., and JONES, J. Pro Tem.
MARVIN, Chief Judge.
In this action arising out of a slip and fall at the Atlas refinery in Shreveport, Atlas appeals a judgment awarding more than $370,000 in damages to Rudd and his wife. In six assignments, Atlas attacks the trial court's findings as to liability, comparative negligence, the excessiveness of the awards and the admissibility of photographs of the loading dock area where Rudd slipped on an accumulation of diesel fuel, dirt and water on the dock surface.
We affirm.

FACTS
Then a 52-year-old who worked as an employee-driver for Petroleum Sales, Inc., as he had done for several years, Rudd drove into the refinery about 10 a.m. on the Wednesday before Thanksgiving in 1986, to load his tanker trailer with diesel fuel for delivery *404 to a Petroleum Sales customer. Atlas has four self-service loading docks for the fuel it refines and sells, one for gasoline and three for diesel. Tanker drivers report to Atlas personnel who give each driver a loading ticket assigning the driver to one of the loading docks where the driver loads the fuel without assistance of Atlas personnel.
The driver connects two hoses to his or her tanker, through one of which the fuel flows. The other hose, weighing about 45 lbs, is a vapor recovery hose designed and used to comply with environmental and safety regulations, which is also connected by the driver to the tanker. Once the amount of fuel specified on the loading ticket is loaded, the driver is required to disconnect the hoses, laying the vapor recovery hose on the concrete drive of the loading dock. The photograph below, introduced by Atlas, generally depicts the scene after Atlas caused the area to be cleaned sometime following Rudd's accident. One of the photographs of which Atlas complains is also identified and reproduced.
*405 
*406 Atlas emphasizes its policy that instructs each tanker driver to wash away with a garden size hose attached to a water faucet at each dock the routine and expected diesel that spills or drains from the hoses at the loading dock. If the spill or accumulation of fuel is of great quantity the driver is instructed to report the spill by intercom available at the dock to an Atlas employee called a "loader rover." The rover who attends to spills that are so reported by a tanker driver is also instructed to wash down the docks at the end of each 8-hour shift.
The surface of the loading dock driveway is rough concrete. Drains are installed in each driveway to collect spilled fuels and the wash water. The record shows that the drains sometimes clog or stop up. No absorbent material such as "oil dry" is available at the docks for the drivers.
The last 8-hour shift change at Atlas occurred at 7:00 a.m., about three hours before Rudd arrived at the refinery on the date of the accident. Atlas presented evidence of its cleanup policies, but no record or testimony about when and by whom the loading rack was actually washed down. On the day of the accident, fifteen other tankers had loaded diesel at the dock where Rudd later loaded diesel fuel in his tanker. The record does not show what number, if any, of these drivers washed down the dock surface after loading his or her tanker.
Rudd had finished fueling his tanker and was taking the vapor recovery hose back to set it on the concrete sidewalk when his left foot slipped, causing him to fall on his buttocks and into the pipes that run from the diesel meter. Rudd's slip and fall caused injury to his back and legs. He did not report the accident to Atlas that day but he did inform a co-worker that day, Wednesday before Thanksgiving. On Friday, November 28, 1986, Rudd reported the accident to the proper authority, Ms. Dean Bennett, at Petroleum Sales, and sought medical treatment. Ms. Bennett's completed accident report incorrectly reflects that the accident was reported to Petroleum Sales on Wednesday, November 26, 1986.
On and after November 28, 1986, Rudd has been treated by several physicians, undergoing back surgery in February 1987. Dr. Warren Long, neurosurgeon, surgically removed herniated lumbar discs, doing laminectomies at two interspaces. Not able to return to work following the accident, Rudd has since received periodical medical treatment.
Rudd had back surgery in 1974, but had been employed as a tanker-driver for Petroleum Sales since 1979 without incident. His job required him to lift heavy equipment and drive 18-wheel trucks and tankers. He had successfully passed periodic employment physicals. During the period from 1979 to 1986, he did not receive any significant medical treatment for his back or miss any time from work.

TRIAL COURT'S FINDINGS
Trial occurred on February 18, 19, 20, 26 and 27, and March 3 and 4, 1992. In reasons for judgment on November 13, 1992, the trial court found that Rudd slipped on an accumulation of fuel, water and dirt at the Atlas loading dock, and that the Atlas dock presented a hazardous condition which was substantially caused by inadequate equipment and practices employed by Atlas. The court also found that Atlas did not rebut the presumption of fault by showing that it took reasonable care in protecting its customers from the foreseeable dangers and hazards. The court specifically mentioned that Atlas did not provide the drivers with oil dry or other absorbent material at its loading docks. The court awarded these damages to the plaintiffs:

Pain and Suffering ........................ $100,000.00
Lost Wages ................................ $116,370.00
Lost Future Wages/Earning Capacity ........ $110,097.00
Past Medical Expenses ($26,225.27)
& Rehabilitation Expenses
 ($3,812.68) .............................. $ 30,037.95
Mrs. Rudd's Loss of Consortium ............ $ 15,000.00
 ___________
TOTAL ..................................... $371,504.95

Atlas asserts the trial court erred in its determinations (1) that the plaintiffs established a hazardous condition existed at Atlas and that the safety and cleanup procedures at Atlas were not reasonably adequate; (2) that Rudd was not comparatively at fault; (3) that plaintiffs' photographs P11-P19 were admissible without any foundation; (4) that *407 $116,370.00 to Mr. Rudd for past lost wages and $110,097.00 was a proper award for lost future wages or loss of earning capacity; (5) that $100,000.00 was a proper award of general damages; and (6) that $15,000.00 to Mrs. Rudd was a proper award for her loss of consortium.

LIABILITY
Atlas's first challenge is that plaintiffs failed in their burden of establishing a hazardous condition under LRS 9:2800.6. Atlas further argues that it met its burden of proving that its inspection and cleanup procedures were reasonably adequate to relieve it of liability in any event under the circumstances of this record.
As originally enacted in 1988, LRS 9:2800.6 applied retroactively to all cases tried on or after the date of approval by the Governor, which occurred July 18, 1988. In 1990, the statute was amended. Section 2 of the 1990 amendments made the Act applicable only to causes of action which arose on or after its effective date. The 1990 amendments became effective September 1, 1990. Even though the accident occurred in 1986, before the 1988 statute was enacted, and because the trial occurred in 1992, we quote and apply LRS 9:2800.6, effective before 1990:
Sec. 2800.6. Liability of a merchant for injuries sustained by a person while on the premises of the merchant
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
D. `Merchant' means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
LRS 9:2800.6 is often referred to as the "slip and fall" statute. To establish a prima facie case, a plaintiff must prove that he slipped in a foreign substance on the merchant's premises which resulted in his injury and which constituted a hazardous condition on the merchant's premises. The burden of proof then shifts to the merchant to exculpate itself from the presumption of negligence. The merchant's burden of proof is twofold. The merchant must prove that its employees did not cause the hazard and that it exercised due care in taking reasonably protective measures to clean the hazards that may have been caused by its customers, e.g., periodic protective measures, inspections and cleanup of its premises. Whether the merchant's periodic protective measures were reasonable must be determined in light of the circumstances of each case considering the risk involved, the merchant's type and volume of business, the floor space utilized for customer service, the time of day, the section of the store and other such considerations. LRS 9:2800.6(B). See: Hall v. Petro of Texas, Inc., 580 So.2d 420 (La.App. 2d Cir.1991), writ denied; Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992), writ denied; Estes v. Kroger Co., 556 So.2d 240 (La.App. 2d Cir. 1990), writ denied.
Atlas maintains that because the facility is an outdoor self-service fueling station with concrete surfaced loading racks, the result in Hall, supra, should be followed. In Hall, the plaintiff slipped and fell on an oil spot outside *408 of a self-service convenience store and truck stop that sold gasoline and diesel from conventional fuel pumps. The plaintiff slipped and fell in the driving lane away from the fuel pump island. This court held that a lesser duty is owed outside of a store where the customer's eyes and attention are not intentionally diverted away from the floor and that the particular protective measures used by the conventional convenience store in Hall were reasonably adequate under the circumstances of that case.
Agreeing with the trial court, we distinguish Hall. The Atlas loading dock is not a conventional convenience store selling fuel. A customer of the conventional convenience store open to the public purchases fuel to operate his or her vehicle, not to re-sell the fuel, and is not required to connect a vapor recovery hose to the vehicle being fueled.
Atlas presented testimony from its personnel that the docks were inspected regularly for spot cleanups, in addition to the regular end-of-shift cleanup procedures. Atlas introduced volumes of its policy and procedure manuals. The record supports the court's findings, however, that Atlas employees neglected to always follow these policies, concluding Atlas's cleanup policies and procedures were inadequate. Atlas could have made available at little cost more effective means to counter the expected spills and drainage from its hoses, specifically absorbent material such as oil-dry. A tanker-driver's only option at Atlas was to call for the Atlas loader-rover on the intercom or to use an ordinary garden-size hose. None of the Atlas witnesses, not even its safety manager, England, could recall the conditions of the loading dock or when it had last been cleaned by an Atlas employee on November 26, 1986.
Rudd and other witnesses, on the other hand, testified that the facility was unreasonably dangerous for several years through November 1986, because of accumulations usually allowed to remain on the surface of the loading docks. One of Rudd's witnesses acknowledged on cross-examination that he had fallen at an Atlas loading dock in the same or similar condition to that described by Rudd, but did not hurt himself. The record also shows that drivers had complained to Atlas about the conditions of the loading dock and the weight of the vapor recovery hose on several occasions. The trial court, in its reasons for judgment, stated that
[t]he defendants' policies and procedures were not followed consistently, as was admitted to by defense witnesses, the loaders, Epperson, Abney and Williams. As Mr. Rudd testified, he only saw the area being washed down possibly five (5) times within a seven (7) year period. Mr. Rudd and the other drivers' testimony is further bolstered by that of Kara Williams, an Atlas employee, who was not called by the defendants, but who testified by deposition that there were constantly spills in that area (P-57), and by defendants' work orders which show that there were constant problems with leaking equipment and malfunctioning equipment, and that defendants' procedures to correct these did not provide for correction of the problems within a sufficiently short period of time to safeguard the drivers who were entering the plant from injury.
Stobart v. State through DOTD, 617 So.2d 880 (La.1993), most recently stated the standard of review:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record *409 in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.

Id. at 882.
The trial court's factual findings and credibility determinations are entitled to great weight and will not be disturbed on appeal absent manifest error. See Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart, supra. The lower court's factual findings are legally permissible and supported by the record. We find no manifest error.

COMPARATIVE FAULT
The trial court explained that it did not consider Rudd to be at fault because he was only following the orders of his employer. The trial court stated that "it has been well settled in Louisiana that an employee who is forced to enter into a hazardous condition as a condition of his employment is not contributorily negligent. Marzula v. T.E. White, Jr., 488 So.2d 1092 (La.App. 2d Cir. 1986)." While this interpretation of Marzula is too broad, the result is not changed. In order to be comparatively at fault, Rudd's conduct must fall below the standard to which he should conform for his own safety and protection, generally being that of a reasonable man under like circumstances. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977).
Rudd was acting within the scope of his employment and was subject to the working conditions and orders of his employer. Had he refused to go to the Atlas facility because of the hazardous conditions, Rudd would have been acting contrarily to the directions of his employer. Under similar circumstances it has been held that a workman whose duties require that he work under hazardous circumstances and who is subsequently injured while "doing his best" to discharge those duties is not guilty of contributory negligence even though he is fully aware of the risk of injury to which he is subjected while performing his work. O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir.1973), writ denied. Rudd was required to act "his best," or reasonably, as an employee of Petroleum Sales, an Atlas customer. He was required to face some risks that were acceptable as routine risks to which his employment might expose him, whether those risks arose out of his driving his tanker or his loading or unloading diesel fuel. Whether the employee acted unreasonably in the face of a known risk is a question of fact. The burden of proving Rudd did not "do his best" or act reasonably in loading his tanker with fuel rests upon Atlas, who alleges his comparative fault. Hughes v. Querbes & Nelson, Inc., 460 So.2d 1161 (La. App. 2d Cir.1984), writ denied.
Rudd had often loaded fuel at the Atlas docks during the seven years he worked for Petroleum Sales. He explained that diesel, water and dirt always were present on the concrete surface of the dock and that the dock was "pretty much in that condition at all times [and] at that particular time." Notwithstanding that he knew that the accumulation was under his feet on the dock on November 26, 1986, as it had been "at all times," Rudd said he did not see the specific accumulation on which he slipped. Atlas would have us conclude that he was unreasonably inattentive so as to reverse the trial court's determination that Rudd was not comparatively at fault. The issue is factual. The trial court finding will not be disturbed absent manifest error. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
Atlas effectively exposed Rudd to the risk of slipping anywhere he had to walk on the surface of its loading dock, and not just slipping on an isolated accumulation where other parts of the surface were dry and relatively safe. Atlas has not shown that Rudd acted hurriedly, rashly, in total oblivion to, or ignoring, the general condition of the surface of the dock. Atlas has not shown Rudd acted other than as a reasonable tanker-driver employee of an Atlas customer who was "doing his best" to complete his loading chore and depart the Atlas facility. The determination whether conduct constitutes comparative fault is a fact specific determination that must be made case by case. On the circumstances of this record we cannot say the trial court's determination that Atlas failed to prove Rudd was comparatively negligent was clearly wrong.

*410 PLAINTIFFS' PHOTOS
Atlas complains of the introduction of exhibits P11-P19 without any foundation as to when, where, by whom these photographs were taken or under what conditions they were taken. Atlas presented its pictures taken in 1991 and the testimony of its personnel, attempting to establish its argued "reasonably safe" condition of the loading dock on November 26, 1986.
Rudd and three others testified that the photos P11-19, offered by Rudd, characterized the conditions as they existed at the Atlas loading dock before and in late November 1986. The trial court admitted all photos into evidence. In its reasons for judgment, the trial court stated
Mr. Rudd's testimony was supported by that of his previous co-workers, J.C. Adams, Sammy Williams and Roy Williams, all of whom testified that the diesel loading dock was not washed down as the defendants argued that it had been, and that the conditions were substantially similar as what was depicted on plaintiffs' exhibits 11-19, and not on the defense photos which were taken in 1991.
The Louisiana Code of Evidence provides in part:
Art. 402. Relevant evidence generally admissible; irrelevant evidence inadmissible
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.
Art. 1002. Requirement of original
To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by this Code or other legislation.
Because the photographs have direct relevance to an issue in controversy, their admissibility is not controlled by the proximity of the date of the photographs to the date of the accident. Lee v. K-mart Corp., 483 So.2d 609 (La.App. 1st Cir.1985), writ denied.
Generally, photographs are admissible when they are shown: (1) to have been accurately taken; (2) to be a correct representation of the subject in controversy; and (3) to shed light upon the matter before the court. State v. Gordon, 582 So.2d 285, 290 (La.App. 1st Cir.1991). It is well settled that a photograph need not be identified by the person who took it to be admissible. State v. Kimble, 546 So.2d 834, 839 (La.App. 1st Cir.1989). A proper foundation for the admission of a photograph is laid when a witness having personal knowledge of the subject depicted by the photograph identifies it as such. State v. Jones, 496 So.2d 638, 640 (La.App. 1st Cir.1986).

State v. Jones, 593 So.2d 1301 at 1309, 1310 (La.App. 1st Cir.1991), writ denied.
The trial court has considerable discretion in the admission of photographs. Its ruling will not be disturbed in the absence of an abuse of that discretion. State v. Gallow, 338 So.2d 920 (La.1976).
Moreover, Atlas's challenge is better described as a complaint about the weight given by the trial court to the photographs and the testimony of Rudd and his witnesses. The trial court assessed the accuracy of the photographs in light of the credibility assigned these witnesses. The court obviously concluded that the plaintiffs' witnesses were truthful in stating that the photos showed the condition of the facility as those conditions existed in November 1986. Credibility determinations about what the photographs depict are clearly within the discretion of the trial court, and may not be disturbed on appeal. Canter v. Koehring Company, 283 So.2d 716 (La.1973), rehearing denied.

DAMAGE AWARDS
Three assignments challenge the trial court's damage awards as an abuse of discretion. Assignment four concerns the awards of $116,370.00 to Rudd for past lost wages and $110,097.00 for lost future wages/ loss of earning capacity. Atlas's challenge also collaterally attacks the trial court's finding that Rudd is permanently disabled, this finding being the basis for the awards. Atlas asserts that Rudd is not permanently disabled because he can perform light work and drive a petroleum truck. As to past lost wages, Atlas argues that these damages should not be awarded after August of 1987, when Atlas claims Rudd was released to *411 return to work. Atlas bases this conclusion on a job description which includes driving a truck a maximum distance of approximately 200 miles and doing light lifting.
Rudd, who has an eighth grade education and no experience in any work other than heavy manual labor, maintains that Atlas is wrongly attempting to characterize driving an 18-wheel tanker and loading diesel fuel as light work or an easy job. Further, Rudd argues that Atlas failed to prove that he could return to his former employment at any time or that he could perform any job, especially one for which he is suited by education, training and experience.
In determining damages, the trial court found that Rudd suffered two herniated discs resulting in lumbar laminectomies and permanent disability, noting that Rudd had been declared totally disabled by Dr. A.E. Dean and 25 percent disabled by Dr. Osborne. The court concluded that Rudd is permanently disabled from performing any job requiring any heavy lifting, bending or stooping, and that he cannot return to his former job as an 18-wheel truck driver. Of course, he can perform some jobs of a lighter duty. However, the trial court concluded that Rudd is disabled from doing any work for which he is suited by education, training and experience.
We observe that Dr. Osborne, assessing a 25 percent disability, squarely noted that he relied solely on general information about Rudd's job requirements:
Q. Whether or not Mr. Rudd Could return to truck driving would depend on what the physical requirements were?
A. I would have to see a job description, yes.
Q. You would have to compare the job description with the limitations you feel Mr. Rudd had in 1987?
A. Yeah. There is a lot of difference in truck driving. You can drive a log truck and have to load the thing and go down rough roads and bang yourself to pieces. And you might be driving on air conditioned eighteen wheeler from here to California. So you have to look at the particular job description.
Q. And you're not aware of what particular job description he had?
A. No, I was not asked to do that. I gave general restrictions.
Although the evidence conflicts as to Rudd's disability, we do not upset the permissible findings of the trial court that are supported by the record. Once we agree with the determination that Rudd is permanently disabled, we then determine if the record provides adequate support for the damage award that is within the reasonable range of discretion of a trier of fact. Before a court of appeal can disturb an award made by a trial court, the record must show that the trier of fact abused its discretion in making the award. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Dr. Dean, who examined Rudd in 1988 for Social Security disability, stated in his deposition as follows:
Q. Okay. You were just called upon to make a determination for Social Security as to whether he wasyou felt he was disabled for the purpose of receiving disability benefits?
A. And eligible for Social Security disability; that is correct.
Q. And your report stated you did feel that he was probably disabled from any work that he was trained for?
A. That is correct.
We find the trial court's awards are reasonable in light of the record. We shall affirm the damages awarded for loss of earnings, past and future.

GENERAL DAMAGES
Atlas also complains of the award of $100,000.00 general damages. Before a trial court award for damages can be questioned as abusive, the reviewing court must look first not to prior awards, but to the individual circumstances of the case. A damage award should not be disturbed by a reviewing court absent a showing of a clear abuse of the discretion of the trial court. Johnson v. Wal-Mart Stores, Inc., 616 So.2d 817 (La.App. 2d Cir.1993); Reck v. Stevens, supra. An articulated analysis of the facts is required to establish an abuse of discretion before comparison of prior awards in similar cases is proper. Johnson, supra.
*412 Drs. Long and McCuller concluded from diagnostic testing that Rudd had a midline disc protrusion at L5-1, and to a certain extent at L4-5. Some of Rudd's symptoms included lower back pain radiating into both legs, numbness, sexual dysfunction and weakness. An MRI done on January 23, 1987, revealed the bulges at each interspace. On these studies, the lumbar laminectomies were performed. Even after surgery, Rudd continued to see Dr. McCuller regularly throughout 1987, complaining of pain in his back and legs. He continued to experience pain in his back and legs through trial. Dr. Dean concluded that Rudd could not sit for more than two hours, nor could he ever lift more than 25 lbs.
The trial court found that $100,000.00 would reasonably compensate Rudd for the aggravated condition of his back and the pain, suffering, inconvenience, and restrictions that he will have to endure for the rest of his life. We find the general damage award was within the range of the trial court's discretion.

CONSORTIUM AWARD
Atlas's final complaint is that the trial court abused its discretion by awarding $15,000.00 to Mrs. Rudd for her loss of consortium.
The compensable elements of damage in a loss of consortium claim are loss of society, sex, and service and support. See LSA-C.C. 2315(B). See also Gaspard v. Transworld Drilling Co., 468 So.2d 692 (La.App. 3rd Cir.1985) and Sharp v. Metropolitan Property and Liability Ins. Co., 478 So.2d 724 (La.App. 3rd Cir.1985). "Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which presumably will, as a result of the injury, have to be obtained from another source and at a price. See Gaspard, supra.

Lonthier v. Northwest Ins. Co., 497 So.2d 774 at 775, 776 (La.App. 3d Cir. 1986).
In 1986, Rudd had been married to Willie Lee Rudd for 19 years. The court found that the Rudd's relationship had changed substantially after the accident in that, among other things, Rudd could no longer garden, provide the lawn care or the support, services and society that he did before the accident. Mrs. Rudd testified that after the accident Rudd cannot comfortably tie his shoes, no longer takes walks with her in the mall or drives with her to visit relatives in Dallas, emphasizing that he wakes her two or three times a night because of his pain and does not have sex with her as often as before the accident.
The consortium award is also a fact-specific determination, to be decided case by case. This award is disturbed only if there is a clear showing of an abuse of discretion. Johnson, supra. On this record, the consortium award is not abusively high.

DECREE
At the cost of Atlas, the judgment is
AFFIRMED.