843 So.2d 1178 (2003)
Michelle PLATT, Plaintiff-Appellee,
v.
INTERSTATE DODGE, Defendant-Appellant.
No. 37,059-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
*1180 M. Randall Donald, Monroe, for Appellant.
Michelle Platt, in Proper Person.
Before WILLIAMS, CARAWAY and KOSTELKA (Pro Tempore), JJ.
CARAWAY, J.
In this case, the defendant undertook repair work on the sunroof of plaintiff's automobile which allegedly resulted in a severe water leak damaging the vehicle. The trial court held the defendant liable for the damage, and defendant appeals. For the following reasons, we amend the damage award in part and affirm the ruling of the trial court.

Facts
In February, 2000, Michelle Platt purchased a used 1998 Dodge Avenger from Car Town. One year later, she asked the service department at the Dodge dealership where she worked, Interstate Dodge ("Interstate"), to repair some minor problems. The car was still covered under the manufacturer's standard 36,000 mile warranty.
One of the vehicle's problems noted by Michelle was a "very mild leak" in the sunroof. She testified that "every three or four times it rained ... one or two beads of water [would] form on the screw ..." The service technician satisfactorily completed the other repairs, most of which were covered by the warranty. However, the sunroof repair was postponed a few days pending receipt of factory replacement parts. At this point, the parties presumed that the sunroof was factory installed and therefore covered by the manufacturer's warranty. After obtaining the replacement parts, the service technician worked on the car for the second time. When he disassembled the sunroof, its gasket and the new gasket "did not match up." He therefore discovered only after disassembling the sunroof that the sunroof was "after market," meaning that it had not been factory-installed and was not covered by the Dodge warranty.
After the above discovery, the service technician, Jimmy Broussard, put the old gasket back in and reassembled the sunroof. Michelle testified that when she was told it was an after-market sunroof, she said "that's fine, just put it back together, like it was," and she would "handle it." However, within a day or two following the work on the sunroof, when she took the car through the carwash, the sunroof leaked badly, flooding the car's interior with water. Because of the flooding, the carpet mildewed, the roof trim was "spongy," and the console lights, lighter, and dome lights no longer worked. The interior roof was water-stained. Further, Michelle *1181 testified that she couldn't drive the car when it rained because it would flood on the inside. She said the sunroof leaked heavily around all four sides while she drove in the rain.
After the initial damage to the car from the carwash episode, Interstate worked on the car twice more attempting to adjust the sunroof so it would not leak so severely. Michelle testified that after two more service visits, Interstate told her they were going to quit working on it, because "every time they touched it, it got worse." Michelle became so upset upon hearing this, she quit her job.
The only defense witness was Interstate's service manager, Mr. Hodge, who described the various service repairs performed on Michelle's car, including the work covered by the warranty. Although Michelle was charged for replacing the alternator and drive belts, because they were non-items, she was not charged for the other, warranted repairs nor for the work on the sunroof. The problem consisted of leaking around the weather stripping. They only discovered the sunroof was after-market after the gasket was pulled out. Hodge testified that there was no way to tell whether or not it was factory or after-market until you took it apart. They put it back together and told Michelle it was an after-market sunroof. When Michelle returned the car after the carwash leak, Hodge then worked on it himself and attributed the leaking problem to excessive wear on one of the slide bars on the inside of the sunroof.
When Interstate attempted to introduce Hodge's handwritten narrative describing the repairs into evidence, Michelle objected because the notes were prepared about a month afterwards. Thereafter, the court refused to admit it and defense counsel proffered the statement as Exhibit D-3. On cross-examination, Hodge confirmed that Michelle quit when they refused to repair her car.
Following trial, without written reasons, the court rendered judgment in Michelle's favor, finding Interstate liable for $1,500.00 in damages. Interstate suspensively appeals. It initially asserts that, because of the lack of warranty regarding the sunroof, there is no basis for liability. It also asserts that the plaintiff's proof of damages was insufficient.

Discussion
The trial court rendered no findings of fact, and Interstate failed to request such findings of fact and reasons for judgment pursuant to La. C.C.P. art.1917. Nevertheless, we must give deference to the trier-of-fact under the manifest error standard for any facts in the record which reasonably support the finding of liability. Bolton v. Louisiana State Univ. Medical Ctr., 601 So.2d 677 (La.App. 2d Cir.1992).
A contract for work or service carries an implied obligation on the contractor to perform in a workmanlike manner, in default of which he must respond in damages for the losses that may ensue. La. C.C. arts.1994 and 2769; Gagliano v. Namias, 479 So.2d 23, 25 (La.App. 4th Cir.1985); Rogers v. Nelson Dodge, Inc., 407 So.2d 443 (La.App. 3d Cir.1981). In addition to contractual liability, this court has recognized that Interstate's actions can also be considered as giving rise to a tort for the want of skill. Moore v. McCullough, 573 So.2d 598 (La.App. 2d Cir.1991); La. C.C. arts. 2315 and 2316. There must be some showing of want of skill, efficiency or knowledge or some lack of ordinary care in the performance of the work or in the selection of suitable equipment or materials. Gagliano, supra.
The trial court could conclude that Interstate undertook the repairs without *1182 properly recognizing that the sunroof was not covered by the factory warranty. Significantly, Interstate did not call Jimmy Broussard, who performed the initial disassembly of the sunroof, to explain why he did not recognize the sunroof as a non-Chrysler product. In any event, if the sunroof could not be identified as a Chrysler product before its disassembly, the evidence indicates that Michelle was not advised at the outset that such disassembly was required to determine whether the warranty applied. Nor was she ever advised that removal and reinstallation of the same gasket might exacerbate the problem.
The trial court could also conclude that faulty workmanship occurred during Broussard's reassembly of the gasket. Within days of his work, the vehicle suffered significant water damage. Reinstalling the used gasket apparently increased the likelihood of leakage. There was no evidence that Broussard tested the sunroof for leakage, and Michelle was not warned of the problem.
Under these circumstances, we believe that Interstate had a duty, attendant to its attempted performance under the Dodge warranty agreement, to fully advise Michelle of the above risks. The cause of the damage to the interior of the vehicle is attributable to Interstate's breach of that duty, not a result of the pre-existing condition of the sunroof and its seal.
In reaching the above conclusion regarding liability, we also reject Interstate's assignment of error pertaining to the trial court's exclusion of the written report of Hodge's work on the sunroof. The report was compiled by Hodge long after Broussard's disassembly of the sunroof. Hodge's subsequent repair efforts are not relevant to the conclusion concerning Broussard's faulty workmanship which the trier-of-fact could determine.
Next, Interstate argues that there was no evidence presented in support of the $1500 damage award. Incidental to this argument, Interstate asserts that the trial court should have excluded the photos of the interior damage to the vehicle because of an insufficient evidentiary foundation for the photos. Those photos were taken by Michelle after the work was done on the sunroof. Generally, photographs are admissible when they are shown: (1) to have been accurately taken; (2) to be a correct representation of the subject in controversy; and (3) to shed light upon the matter before the court. Rudd v. Atlas Processing Refinery, 26,048 (La.App.2d Cir.9/21/94), 644 So.2d 402, writ denied, 94-2605 (La.12/16/94), 648 So.2d 392. From Michelle's testimony, we are satisfied that these criteria were met and the trial court properly admitted the photos into evidence.
From the testimony of Michelle and the photos of her car's interior, we believe the trial court had sufficient evidence to make a nominal award for the damage to the car's interior. Additionally, the trial court could award damages for Michelle's inconvenience caused by the leaking roof. She testified that she would not use the vehicle when it rained.
The remaining item of damage claimed by Michelle is the replacement cost of a sunroof. At trial, over objection by Interstate, she testified that she had received an estimate of $599 for the replacement cost of the sunroof. Interstate now re-urges its objection to this item of damage.
From our consideration of the warranty obligation and the breach of Interstate's duty to Michelle arising from its initial work on the sunroof, we find that the *1183 evidence clearly establishes that the existence of the Dodge warranty did not necessitate the replacement of the after-market sunroof. Interstate's duty was to have recognized the after-market sunroof before attempting its repair or to have warned Michelle of the greater potential for leakage following the mistaken disassembly of the sunroof and the disturbance of the gasket seal. While the breach of Interstate's duty makes it liable for the subsequent water damage to the vehicle, Michelle was responsible for the repair or replacement of the after-market sunroof which was not covered by the Dodge warranty.
Accordingly, the trial court's award of damage is reduced to $900 and the judgment as amended is affirmed. Costs are assessed to appellant.
JUDGMENT AMENDED, AND AS AMENDED, AFFIRMED.