616 So.2d 817 (1993)
Clairgein JOHNSON, Plaintiff-Appellee,
v.
WAL-MART STORES, INC. and National Union Fire Insurance Company, Defendants-Appellants.
No. 24646-CA.
Court of Appeal of Louisiana, Second Circuit.
March 31, 1993.
*819 Carl Rice and Associates by William F. Kendig, Shreveport, for plaintiff-appellee.
Mayer, Smith & Roberts by Vicki C. Warner, Shreveport, for defendants-appellants.
Before NORRIS, LINDSAY and VICTORY, JJ.
LINDSAY, Judge.
Wal-Mart Stores, Inc. and National Union Fire Insurance Company, the defendants in this slip and fall case, appeal the trial court judgment which held them liable for the injuries sustained by the plaintiff, Clairgein Johnson, and awarded damages of $22,228.67 in her favor. For the reasons set forth below, we amend the judgment and, as amended, affirm.

FACTS
On Sunday, December 3, 1989, the plaintiff went shopping at the Wal-Mart store on Jewella Road in Shreveport. She was accompanied by her husband, Eziekel Johnson, and one of their grandchildren. Mr. Johnson, who was looking for a toolbelt, pushed a shopping buggy down an aisle in the automotive department while the plaintiff followed behind him. Suddenly, the plaintiff slipped on a puddle of liquid and fell on her right side. (Although the testimony differed on whether the liquid was clear or white, the witnesses agreed that the substance was difficult to see on the white floor.)
Mr. Johnson turned when he heard the plaintiff cry out. He and Don Jones, a Wal-Mart sales clerk working in the automotive department, helped the plaintiff to her feet. Mr. Jones observed a plastic bottle of "Son of a Gun" on the floor about a foot and a half from the counter. "Son of a Gun" is an oil-based liquid used for cleaning vinyl or leather upholstery. While the bottle lid was closed, it was not screwed on tightly.
The assistant manager, Bernard Mack, was promptly informed of the accident. When he arrived at the site of the fall, he personally cleaned the "Son of a Gun" liquid from the plaintiff's shoes with a paper towel. Then the plaintiff and her husband went with Mr. Mack to his office where he inquired into the circumstances of the plaintiff's fall. Since Mr. Mack was unable to locate any of the store's accident report forms, he took notes on a yellow note pad.
After their conversation with Mr. Mack, the Johnsons paid for Mr. Johnson's toolbelt and left the store. After taking their grandchild home, they went to the emergency room at Schumpert Medical Center, where the plaintiff sought treatment for injuries to her right side. X-rays were taken, and the doctor prescribed pain medication for her discomfort. She was also instructed to take hot, soaking baths.
The following day, December 4, 1989, Mr. Johnson returned to the store to obtain a copy of the accident report. Upon examination of this document, he determined that *820 some of the information filled in by Mr. Mack was wrong, i.e., the time and date of the incident, and the type of shoes worn by the plaintiff. When he drew these mistakes to the assistant manager's attention, Mr. Mack corrected them and initialed the changes.
Due to the injuries she sustained in the fall, the plaintiff was unable to return to her job as a cook for the Caddo Parish School Board. She was off work for one week following the accident. During this week, she sought additional medical treatment from her family physician, Dr. James May.
In January, 1990, the plaintiff also consulted Dr. Harold Bicknell, an orthopedist. She returned to see him again in October, 1990. At the time of her third appointment on November 6, 1990, Dr. Bicknell referred her to his son, Dr. Eric Bicknell, for an EMG nerve conduction test. This test was performed on November 13, 1990. Her last appointment with Dr. Harold Bicknell was in April, 1991.
On December 2, 1990, the plaintiff filed suit against Wal-Mart and its insurer. A bench trial was held on March 24 and 25, 1992.
At trial, the plaintiff and her husband testified that she slipped and fell because of a puddle of slippery liquid on the store floor. The defendants then sought to exculpate themselves from liability by presenting the testimony of several Wal-Mart employees. They included Mr. Jones; Mr. Mack; Aubrey Metcalf, the utility person or maintenance man who was on duty the day of the accident; and William Tidwell, an assistant manager at the Jewella store.
On April 7, 1992, the trial court ruled in favor of the plaintiff and against the defendants. In its reasons for judgment, the trial court found that the plaintiff's fall was caused by a foreign substance on the floor, i.e., the "Son of a Gun" liquid cleaner. Having found that the plaintiff's fall was caused by a hazardous condition on the premises, the court then considered whether the merchant had successfully exculpated itself from liability by showing that it acted in a reasonably prudent manner to keep the premises free of such hazardous conditions.
The trial court held that Wal-Mart's clean up procedures were not reasonable under the circumstances and that it had thus failed to exculpate itself from liability. No utility person was on duty at the time of the accident. Considering that the cleanup crew had not worked the night before, the size of the store and the large volume of sales that day, the court concluded that Wal-Mart's management had failed to provide an adequate number of utility personnel to work on a busy Christmas season weekend. The court was not impressed with the testimony of Don Jones that he walked down the aisle where the plaintiff fell only five minutes before the accident and that he saw nothing on the floor at that time.
The trial court further found no comparative fault on the part of the plaintiff and awarded general damages of $20,000 in her favor. It also awarded her medical expenses as special damages. A judgment in the amount of $22,228.67 was signed on April 7, 1992.
The defendants appealed. They assign as error the following: (1) the trial court erred in finding that Wal-Mart failed to exculpate itself from liability; and (2) the trial court erred by awarding excessive damages.

EXCULPATION FROM LIABILITY

Law
The initial burden of proof rested on the plaintiff to show that she was injured due to a hazardous condition on the store premises. Then the burden of proof shifted to the merchant/store owner to exculpate itself from liability in compliance with LSA-R.S. 9:2800.6.
Prior to its amendment in 1990, LSA-R.S. 9:2800.6 provided as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable *821 effort to keep the premises free of any hazardous condition which reasonably might give rise to damage.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
D. "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
Although the owner of a commercial establishment has an affirmative duty to keep the premises in a safe condition, he is not the insurer of the safety of his patrons. Clesi v. Tenneco, Inc., 560 So.2d 992 (La.App. 4th Cir.1990); Hall v. Petro of Texas, Inc., 580 So.2d 420 (La.App. 2nd Cir.1991), writ denied, 584 So.2d 682 (La.1991); Hess v. Schwegmann Giant Super Markets, Inc., 595 So.2d 754 (La.App. 4th Cir.1992).
To establish a prima facie case in a slip and fall lawsuit under circumstances such as exist in this case, the plaintiff must prove that he suffered injury as a result of a hazardous condition while on the merchant's premises, that he slipped in a foreign substance, which resulted in his injury. The burden then shifts to the merchant to exculpate itself from the presumption that it was negligent LSA-R.S. 9:2800.6(B); Hall, supra; Estes v. Kroger Company, 556 So.2d 240 (La.App. 2d Cir.1990), writ denied, 559 So.2d 1360 (La.1990).
The merchant's duty of care requires that reasonable protective measures, including periodic inspections, must be undertaken to ensure that the premises are kept free from substances that might cause a customer to fall. Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976); Hall, supra; Castille v. Great Atlantic & Pacific Tea Company, 591 So.2d 1299 (La.App. 3d Cir.1991).
Whether the protective measures were reasonable must be determined in light of the circumstances of each case, commensurate with the risk involved, the merchant's type and volume of merchandise, the type of display, the floor space utilized for customer service, the volume of business, the time of day, the section of the store, and other such considerations. Arnold v. T.G. & Y. Stores, Company, 466 So.2d 529 (La.App. 3d Cir.1985), writ denied, 470 So.2d 126 (La.1985); Hall, supra; Castille, supra.

Testimony of Store's Employees
In the instant case, it is undisputed that there was a foreign substance on the floor. The spill of an oily cleaner which was difficult to see on the floor was clearly a hazardous condition. The burden then shifted to the defendant to establish that it acted in a reasonably prudent manner in exercising the duty of care it owed to keep the premises free of any hazardous conditions. Our review of the record reveals that the evidence was sufficient to support the trial court's determination that Wal-Mart did not implement adequate cleanup procedures.
In its efforts to carry its burden of proof, the defendant presented the testimony of several of its employees. Bernard Mack was the assistant manager in charge of opening and closing the store the weekend of the plaintiff's accident. He testified that he walked through the entire store the night before the accident and saw nothing on the floor at that time. The next morning *822 he arrived at about 10 a.m. and patrolled the store again. Once again he found no spills on the floor.
Aubrey Metcalf, a Wal-Mart maintenance employee, testified that he arrived at the store at about 10 a.m. on the morning of the accident and that he only worked about three hours that day. He testified that he swept the entire store that Sunday morning prior to its opening. The evidence revealed that he also performed a "safety sweep" of the whole store, beginning the cleanup procedure at approximately 12:09 or 12:11 p.m. and completing the automotive department approximately 11 to 13 minutes later, or at 12:24 p.m. at the latest. He clocked out at 12:54 p.m., well before the plaintiff's accident.
William Tidwell, an assistant manager at the Jewella store, testified as to Wal-Mart's cleanup procedures and practices. Under the safety sweep program, the store has a maintenance worker who is responsible for actually walking the floors and sweeping every two hours. At the time of the plaintiff's fall, no written logs of the safety sweeps were kept. All of Wal-Mart's employees share responsibility for keeping the store clean and free of hazards. The store management also calls for its employees to perform "zone defenses" three times a day. In this procedure, when the management announces a zone defense over the public address system, all of the store employees walk the aisles of their particular areas of the store to look for any possible hazards. However, there is no evidence of any zone defense being called on the day of the accident.
Mr. Tidwell also testified that the store has a safety committee consisting of employees from various departments which meets once a week and tours the facility to look for potential hazards. However, there is no evidence as to when this committee last met before the plaintiff's accident. Additionally, a night crew comes into the store every night except the weekend to mop and wax the floors. Thus, the crew did not clean the floor the Saturday night before the plaintiff's fall on Sunday afternoon.
Mr. Tidwell testified that the store size is approximately 99,900 square feet, although much of that space is filled with merchandise. He testified that the gross retail receipts of $63,444.48 for December 3, 1989 were indicative of a very busy day at the Jewella store. Pursuant to his review of the personnel records, Tidwell testified that 75 employees worked that day, but Mr. Metcalf was the only "utility" employee on duty that day. Mr. Tidwell testified that after Mr. Metcalf left that day, the safety sweep was the responsibility of another employee, Gary Garner. (Mr. Garner no longer worked for Wal-Mart and did not testify at trial.)
Don Jones, who was working in the automotive department on the day of the accident, testified that he walked the aisle where the plaintiff fell about five minutes before the accident. He testified that he did not see anything on the floor at that time. However, his testimony is unclear as to whether he was looking at the floor, checking for spills, or just routinely walking through the area while stocking shelves.
An important factor in determining the reasonableness and adequacy of Wal-Mart's safety procedures is the time of the accident. The testimony of the witnesses was in substantial conflict on this issue.
The plaintiff testified that she and her family arrived at the store somewhere around 1 p.m. Her husband testified that he did not recall exactly when they arrived at Wal-Mart. However, he was certain they had left the store before 3 p.m. because they arrived at the emergency room somewhere between 2 and 3 p.m.
At trial, Mr. Jones testified that while he didn't recall when the accident occurred, he thought it was around 12:00 or 12:30 p.m. In his deposition, he said the accident occurred around "probably the middle of the day," but it was unclear whether he meant the middle of the full day or of the "short" Sunday work day of noon to 6:00 p.m.
The accident report filled out by Mr. Mack was admitted into evidence, as was the corrected copy given to the plaintiff's husband the day after the accident. The *823 original report stated that the accident occurred at 3:00 p.m. The corrected report shows that it occurred at 1:30 p.m., and this change is initialed by Mr. Mack. As previously noted, the changes to this report were made after Mr. Johnson examined the report and noted several errors.
Mr. Mack testified at trial that the accident occurred around 1 p.m. He also testified that until he heard Mr. Johnson's testimony he had completely forgotten about their conversation the day after the accident and the corrections he made on Mr. Johnson's copy of the report.
The trial court specifically declined to place any reliance upon Mr. Mack's testimony, finding that the evidence demonstrated that he had no idea when the fall happened. Instead, the trial court found that the most reliable evidence was the information contemporaneously provided by the Johnsons upon their arrival at the emergency room. The Schumpert emergency room admission report notes their arrival time as 2:35 p.m., and the patient history states that the accident occurred 30 minutes before their arrival at the medical center. This roughly corresponds with the testimony of the Johnsons that they dropped off their grandchild before proceeding to the emergency room.
In view of its determination that the accident occurred somewhere between 1:45 to 2:00 p.m., the trial court concluded that the store's cleanup procedures were inadequate. Because it was a weekend, the night crew did not clean the floor the night before the plaintiff's fall, even though Saturday is Wal-Mart's busiest day of the week. Only one maintenance employee worked on the day of the accident, and he left shortly before 1 p.m. Also, the testimony demonstrated that the area where the plaintiff fell was last swept somewhere around 12:15 p.m. In particular, the trial court noted that the accident occurred on a weekend during the Christmas shopping season, and the store's receipts demonstrated that it was a busy shopping day. Considering that the cleanup crew had not worked the night before, the size of the store and the large volume of sales that day, the court concluded that Wal-Mart's management had failed to provide an adequate number of utility personnel to work on a busy Christmas season weekend.
After reviewing Mr. Tidwell's testimony as to Wal-Mart's various safety procedures, we are reluctant to find that the procedures themselves were inadequate. However, we find that the record fails to demonstrate that these procedures were actually and fully implemented and documented by Wal-Mart employees on the day of the accident. For example, other than the general statement that they are called three times a day, there was no testimony or documentation that any zone defenses were actually done on the day of the fall.
Furthermore, the trial court implicitly rejected the testimony of Mr. Jones that he had walked the aisle in question five minutes before the plaintiff's fall and did not see anything on the floor. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. For only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
In support of their contention that Mr. Jones' testimony was sufficient to exculpate the store from liability, the defendants cite several cases wherein employees testified that inspections were conducted within minutes of the accidents. However, both are distinguishable from the present case. First, in the instant case, the trial court rejected the testimony of Mr. Jones, as mentioned above. We note that Morgan v. Stanley Stores, Inc., 550 So.2d 733 (La.App. 2d Cir.1989), was a case in which this court applied the manifest error rule and affirmed the decision of the trial court rejecting the plaintiff's demands where the trial court was satisfied that the store owner had successfully rebutted the presumption of negligence. Specifically, the trial court in that case accepted the employee's testimony that he had inspected the area of *824 the accident less than five minutes before Mrs. Morgan fell. Although the appellate court in Hess v. Schwegmann Giant Super Markets, Inc., supra, found that the trial court committed manifest error in ruling in favor of the plaintiff, there the store had presented extremely detailed written logs which were maintained by the porterette in charge of cleaning and which demonstrated that inspections had been made within, at most, twenty minutes of the accident. (In that case, the evidence demonstrated that the accident could have occurred within two possible time periods; however, the logs demonstrated numerous inspections within close proximity of either period.)
In the present case, Mr. Jones' testimony was not corroborated by any such records. Therefore, based on the evidence in the record and in view of the trial court's credibility call, we cannot find that the trial court was manifestly erroneous. Rosell v. ESCO, supra.
This assignment of error is without merit.

DAMAGES
The defendants also argue that the trial court abused its discretion in awarding general damages of $20,000 and special damages of $2,228.67. They contend that the plaintiff's injuries were minimal and that her wrist injury in particular was not related to the accident. They maintain that the general damages should be reduced to $5,000 and the special damages should be reduced to $859.20.

Law
Where an accident victim was in good health before an accident, but shows that after the accident a disabling injury manifested itself, and that there was a reasonable possibility of causal connection between the injury and the accident, it is presumed, subject to rebutting evidence, that the accident caused the injury. Simpson v. Caddo Parish School Board, 540 So.2d 997 (La.App. 2d Cir.1989). When some symptoms of an injury appear shortly after a traumatic incident that are consistent with that incident and continuously worsen, a defendant who contests the cause-in-fact relationship must show some other particular incident could have caused the injury in question to overcome plaintiff's case. Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.App. 2d Cir.1986).
Before a trial court award for damages can be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. A damage award should not be disturbed by a reviewing court absent a showing of a clear abuse of the discretion vested in the trial court. Carroll v. St. Paul Insurance Company, 550 So.2d 787 (La.App. 2d Cir.1989); Reck v. Stevens, 373 So.2d 498 (La.1979).
It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper. Carroll, supra.
The appropriate procedure for testing whether the trier of fact has abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the fact finder. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987); Carroll, supra.
Only after finding that the record demonstrates that the trial court abused its much discretion can the appellate court disturb the award and then only to the extent of lowering an excessive award to the highest point which is reasonably within the discretion afforded that court. Carroll, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).

The Evidence
Following her fall, the plaintiff was seen in the emergency room where she was examined and x-rays were taken of her right shoulder, hip, and knee. She had multiple contusions to these areas. She was given a prescription for pain medication and advised to take hot soaking baths to alleviate *825 her discomfort. It was also recommended that she consult an orthopedist if her condition failed to improve or worsened.
The plaintiff was unable to report to her job the week after the accident. (As she had only recently been hired, she did not feel she could take any more time off.) On December 7, 1989, she saw Dr. May, her family physician, who found that she was suffering from a sprain and contusion of the chest and shoulder. She also had tenderness in her knee. She was told to apply ice, and she was given an injection of Celestone and a prescription for Feldene. She saw Dr. May again on April 2, 1990, at which time he gave her an orthopedic carpal tunnel splint for her wrist.
The plaintiff first consulted Dr. Harold Bicknell on January 2, 1990; her chief complaint at that time was pain in her left foot. She also had some lower back pain. Dr. Bicknell diagnosed tendonitis and residual strain of the left foot and prescribed an anti-inflammatory drug. Her next appointment with him was on October 30, 1990. She was complaining of pain in her right wrist and right knee, which she related to the fall at Wal-Mart. She had also experienced some numbness in her right hand. Dr. Bicknell diagnosed the plaintiff as suffering tendonitis in her knee, and he felt that the wrist problem was indicative of early carpal tunnel compression of a median nerve. He recommended that she undergo an EMG or nerve conduction test. Furthermore, the history related by the plaintiff at this time indicated that between her first two appointments with Dr. Bicknell, she had been taking Motrin and Ecotrin and utilizing the hot bath therapy originally recommended by the emergency room personnel.
The plaintiff returned to see Dr. Bicknell again on November 6, 1990, at which time she reported continuing pain in her right wrist and hand. At this time, an appointment with Dr. Eric Bicknell for the EMG test was scheduled. The results of this test revealed minimal carpal tunnel syndrome in the right wrist and hand. Dr. Harold Bicknell then placed her on a steroid medication in an attempt to reduce the inflammation in the nerves.
The plaintiff's last appointment with Dr. Bicknell was in April, 1991, at which time she complained of increased pain in her right wrist and hand. The doctor diagnosed the plaintiff as suffering from tenosynovitis or inflammation of the tendon sheath. At this time, he prescribed Naprosyn and a wrist brace. However, surgery was not recommended.
Dr. Bicknell concluded that, based on the plaintiff's history, it was more probable than not that the fall in Wal-Mart caused the plaintiff's subsequent medical problems. In so concluding, the doctor was aware that the plaintiff had previously been a line worker at AT & T, her employment there terminating four years before the accident. However, he felt that if her wrist injury had been caused by her repetitive hand work at AT & T, the symptoms would have manifested themselves at an earlier time.
The plaintiff testified that her right knee and shoulder hurt immediately after the accident. The pain in her right hand and wrist developed within a few weeks of the fall. Additionally, she testified at trial that she was still having pain in her right shoulder, knee, and wrist, but that her medication made the pain manageable. Although she had pain in her knee and wrist between her first and second appointments with Dr. Bicknell, she did not return to see him again for nine months because of the expense. When she did consult him again, she had to undergo an extremely painful nerve conduction or EMG test. The elastic bandage prescribed for her by Dr. Bicknell eased her wrist pain considerably. However, she cannot wear it when she works, and sometimes she has difficulties doing her job as a result of not wearing it.
Mr. Johnson corroborated his wife's testimony that she was not in pain before the fall. He also testified that his wife finally returned to see Dr. Bicknell in October, 1990, at his suggestion, because he knew she was continuing to suffer.

*826 Discussion

The plaintiff demonstrated that prior to the fall she was in reasonably good health. As a result of the accident, she sustained a sprain to her right shoulder, tendonitis in the knee, contusions to her hip, and carpal tunnel syndrome and tenosynovitis in the right hand and wrist. Two years after the accident, the shoulder, knee and wrist injuries continued to require prescription medication for pain management. The carpal tunnel syndrome in the plaintiff's right wrist is still present and requires a wrist brace which interferes with the performance of the plaintiff's employment duties. We note that the trial court, which observed her demeanor, specifically found the plaintiff to be "very credible" and concluded, based upon its observations, that she was, in fact, hurt. Dr. Bicknell, her treating physician, testified that her injuries were caused by her fall, and not by her previous employment or any other accident. The defendants failed to rebut this evidence, and we find no error in the trial court's findings concerning the plaintiff's injuries.
Furthermore, we find no abuse of the court's discretion in assessing $20,000 in general damages. Nor do we find error as to the items awarded for special damages. When the evidence is viewed in the light most favorable to the plaintiff, the award is not abusively high. However, we have found a slight mathematical error in the computation of the special damages.[1] Accordingly, we amend the judgment of the trial court to award special damages of $2,106.13, not $2,228.67.
Therefore, this assignment of error is without merit.

CONCLUSION
The judgment of the trial court is amended to award special damages of $2,106.13. As amended, the judgment is affirmed. Costs are assessed against the defendants/appellants.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Our computation of the special damages allowed by the trial court is as follows:

Schumpert Medical (services) $ 435.00
 Center (records) 32.70
Drs. Carroll/Grindle 120.00
Dr. May (services) 104.00
 (records) 48.00
Dr. H. Bicknell (services) 319.00
 (expert fees) 250.00
 (court reporter) 172.50
Dr. E. Bicknell (services) 381.00
Glenwood Drug Store 43.73
Lost wages 200.20
 _________
TOTAL $2,106.13