690 So.2d 933 (1997)
Jean CARTER, Plaintiff-Appellee,
v.
BROOKSHIRE GROCERY CO. and ITT Hartford Insurance Company, Defendants-Appellants.
No. 29166-CA.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1997.
Writ Denied May 1, 1997.
*934 Lunn, Irion, Johnson, Salley & Carlisle by James A. Mijalis, Shreveport, for Defendants-Appellants.
J. Allen Cooper, Jr., Shreveport, for Plaintiff-Appellee.
Before GASKINS, CARAWAY and PEATROSS, JJ.
GASKINS, Judge.
In this slip and fall case, Brookshire Grocery Co. and its insurer, ITT Hartford Insurance Company, appeal from an adverse trial court judgment. The plaintiff, Jean Carter, answered the appeal, seeking to increase her award of damages and to decrease the degree of comparative fault assessed against her. For the reasons assigned below, we amend the trial court judgment and, as amended, affirm.

FACTS
On October 1, 1992, sometime after 9 p.m., the plaintiff, a registered nurse, entered the *935 Brookshire's store on Kings Highway in Shreveport. For 15 to 20 minutes, she shopped for groceries. While standing in the check-out line, the plaintiff realized that she had forgotten an item. Leaving her shopping cart in line, she walked to the back of the store to retrieve a container of whipped cream.
At about 9 p.m., Scott Mutter, a store courtesy clerk, had begun mopping the rear aisle of the store as part of the normal evening clean-up procedure. Two "wet floor" signs and three orange cones were set up in the area where he was mopping. At one point, Scott was called away from his mopping to assist at the front of the store. He subsequently returned to his mopping task. When assistant store manager Kevin McLane conducted a floor inspection shortly after 9:30 p.m., Scott was still mopping, and the floor near the dairy case was wet. At about 9:50 p.m., some 30 minutes after Scott mopped the floor near the dairy case, the plaintiff fell in that area while looking for whipped cream. According to the plaintiff, when she got up, her clothing was wet.[1] However, Mr. McLane testified that when he conducted an inspection of the area moments after the fall, the floor was dry.
The plaintiff's fiancé took her to the emergency room that night. She was examined, given pain medication, and discharged. The next day, the plaintiff saw Dr. G. Michael Haynie, an orthopedic surgeon, who diagnosed a left wrist sprain and a contusion of the left hip. He noted that she also had a ganglion on her left wrist which she said predated the fall. He released her from work for one week and prescribed physical therapy. Dr. Haynie saw her for the secondand lastoccasion on October 9, 1992.
Another orthopedist, Dr. Edward L. Morgan, saw the plaintiff on October 15, 1992, at which time her primary complaint was her left shoulder. He diagnosed tendinitis in the shoulder, prescribed Naprosyn (an anti-inflammatory medication), and restricted her to light work duty. Although he told her to return if she did not improve, he never treated her again. However, his records showed that his partner Dr. Dean saw her on November 1, 1993, for a flare-up involving her shoulder. The record indicated that Dr. Dean gave her injection of Celestone and a prescription for Naprosyn, and that he may have suggested physical therapy.
At the time of the accident, Dr. John Ferrell saw the plaintiff on a daily basis due to her employment in the rehabilitation department at P & S Hospital. Aware of her persistent wrist problem, he suggested that she allow him to give her an injection and put her wrist in a cast to facilitate its healing. On May 19, 1993, he saw her in his office, at which time she was x-rayed. From the x-rays, Dr. Ferrell was unable to discern any fracture or instability patterns. She tested positive on a test for deQuervain's disease (fibrosis of the sheath of a tendon in the thumb) in her left wrist. He saw her again on May 31, 1993, at which time she had decreased swelling, but still some tenderness and a ganglion. In October 1994, he saw her in the office again. At that time, he no longer found signs of deQuervain's disease. He suggested further conservative treatment of the ganglion but stated that surgery was a future possibility.
The plaintiff sued the grocery store and its insurer, claiming that she sustained injuries to her left arm, hand, hip and shoulder in the fall. At trial, she asserted that the incident aggravated her ganglion, which would require surgical removal.
Following a bench trial, the trial court ruled in favor of the plaintiff, finding that she had carried her burden of proof under La. R.S. 9:2800.6. The court found that, under the facts of this case, mopping during business hours created an unreasonable risk of harm. While the court did not equate mopping during store hours with negligence per se, it found an unreasonable risk of harm; specifically, the store employee created a situation where a customer had to cross a freshly mopped area to obtain a shopping item. The court found that the area could have been roped off and customer assistance provided to obtain items in the marked off area. However, comparative fault of 65% to the store and 35% to the plaintiff was assessed. *936 The trial court found that the warning signs were such that a reasonably attentive person should have seen and heeded them.
The trial court found that the plaintiff did not sustain a severe, debilitating injury, but soft tissue injuries to her left hip, left wrist, left shoulder, and neck. In addition to general damages of $25,000, it granted an award of $5,000 for future medical expenses for the surgical removal of the ganglion which she claimed was aggravated by the accident; however, the trial court specifically noted that when she consulted a doctor about the ganglion she failed to mention any possible connection between it and the fall. The court discounted her assertion that the fall caused her to develop deQuervain's disease in her left wrist, and it rejected her claim for lost wages due to loss of "on-call" status.
The following damages were awarded by the trial court:

Past medical expenses $ 4,298.97
Future medical expenses 5,000.00
Lost wages 2,208.00
Pain and suffering 25,000.00
 __________
Total $36,506.97

The defendants appealed. They complain that the trial court erred in holding it liable, assessing 65% comparative fault against it, and awarding excessive damages. The plaintiff answered the appeal; she contends that the trial court assessed too high a percentage of fault against her and awarded inadequate damages.

LIABILITY UNDER LA.R.S. 9:2800.6
In three assignments of error, the defendants challenge the trial court's finding that the store was liable for the plaintiff's injuries under La.R.S. 9:2800.6.

Law
La.R.S. 9:2800.6, which is often referred to as the "slip and fall" statute, provides, in relevant part:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
Although the owner of a commercial establishment has an affirmative duty to keep the premises in a safe condition, he is not the insurer of the safety of his patrons. Johnson v. Wal-Mart Stores, Inc., 616 So.2d 817 (La.App. 2d Cir.1993). A patron must exercise reasonable care for his own safety when facing obvious hazards. Adkinson v. Brookshire Grocery Company, Inc., 95-1021 (La.App. 3d Cir. 1/31/96), 670 So.2d 453, writ denied, 96-0514 (La. 4/8/96), 671 So.2d 339.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The Louisiana Supreme Court announced a two-part test for the reversal of a fact finder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120 (La.1987); Stobart v. State through DOTD, 617 So.2d 880 (La.1993).
*937 The trial court's factual findings and credibility determinations are entitled to great weight and will not be disturbed on appeal absent manifest error. See Rosell v. ESCO, supra.

Discussion
We agree with the trial court that, under the "slip and fall" statute, a wet floor in a grocery store created an unreasonable risk of harm to the patrons and that the risk of injury was reasonably foreseeable. Since the floor was wet due to being recently mopped by a store employee, the merchant had notice of the condition prior to the fall. Thus, the pertinent question in the instant case is whether the store "failed to exercise reasonable care." See La.R.S. 9:2800.6(B)(3).
The two photos taken moments after the plaintiff's fall show five "wet floor" signs and/or orange cones arrayed across the back aisle. The yellow signs, which bear the words "CAUTION" and "WET FLOOR," are set up so as to be read by persons walking along the back aisle. However, they are turned in such a manner that a person walking up an intersecting store aisle would have difficulty reading them.[2] Additionally, the signs are spaced quite a distance apart, making it difficult to determine what portion of the long rear aisle of the store was actually wet.
We find that, given the size of the area mopped, the number of warning signs and their positions were not adequate to constitute an exercise of "reasonable care" by the defendant store. Consequently, we find that the trial court was correct in finding the defendant store liable under the statute.

COMPARATIVE FAULT
As previously mentioned, the trial court assessed fault of 35% to the plaintiff and 65% to the defendants. Both the plaintiff and the defendants complain of these percentages.
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), the Louisiana Supreme Court has set forth the following factors for comparing the parties' fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Allocation of fault is also a factual determination subject to the manifest error rule. Theriot v. Lasseigne, 93-2661 (La. 7/5/94), 640 So.2d 1305.
We find no manifest error in the trial court's apportionment of fault. Under the facts presented in this case, the defendant store bore the greater degree of responsibility and must thus bear a corresponding degree of fault. However, while the placement of the store's "WET FLOOR" signs and cones was significantly less than ideal, the plaintiff bore the responsibility of exercising reasonable care for her own safety. By her own admission, she was not in a hurry. As she approached the intersection of the aisle she was traversing and the rear aisle of the store, a reasonable person proceeding at the speed she claimed should have been able to view the presence of at least one of the signs and/or cones in the back aisle, if not their wording. At that point, she was obliged to advance with greater caution.
We affirm the trial court's assessments of comparative fault.

GENERAL DAMAGES
The trial court awarded general damages of $25,000. The defendants contend that this *938 amount is excessive and should be reduced to $5,000. On the other hand, the plaintiff asserts that the award is inadequate and should be raised to at least $35,000.
In Sledge v. Continental Casualty Co., 25770 (La.App. 2d Cir. 6/24/94), 639 So.2d 805, we discussed appellate review of awards of general damages:
In assessing damages in cases of offenses, quasi-offenses, and quasi-contracts, much discretion must be left to the judge or jury. LSA-C.C. Art. 2324.1. Before an appellate court may disturb such an award, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Reck v. Stevens, 373 So.2d 498 (La.1979); Brimer v. Copeland, 604 So.2d 1388 (La.App. 2d Cir.1992). In determining whether the trier of fact abused discretion by making an excessive award, the evidence must be viewed in the light most favorable to the plaintiff, whereas an inadequate award is viewed in the light most favorable to the defendant. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987). Of course, upon finding an award is, in either direction, beyond that which a reasonable trier of fact could assess, the reviewing court may lower (or increase) an award of general damages to the highest (or lowest) amount that could appropriately be granted. Youn, supra; Brimer, supra. However, it is only after an articulated factual analysis discloses such abuse that guidance from prior awards becomes relevant. Youn, supra; Reck, supra; Thomas v. Petrolane Gas Service, Ltd., 588 So.2d 711 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1201 (La.1992).
The plaintiff suffered soft tissue injuries to her left hip, left shoulder, left wrist, and neck. Initially, her injuries were quite painful and restricted her activities, both work and recreational. She required medication and physical therapy for a period of several weeks. However, as the trial court correctly found, her injuries were not severe or debilitating. Both Dr. Haynie and Dr. Morgan who treated her shortly after the accident found that she was not seriously hurt and expected her condition to resolve over time without restrictions.
Based upon our review of the record, we find no abusein either directionof the trial court's great discretion in awarding general damages.

SPECIAL DAMAGES

Past Lost Wages
Lost earnings need not be precisely proven, but they must be shown with reasonable certainty. Moore v. Chrysler Corporation, 596 So.2d 225 (La.App. 2d Cir. 1992), writs denied, 599 So.2d 316, 317 (La. 1992); Finley v. Bass, 478 So.2d 608 (La. App. 2d Cir.1985). An award for lost past wages can be computed on the amount the plaintiff would have in all probability been earning at the time of trial. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Maynor v. Vosburg, 25922 (La.App. 2d Cir. 11/28/94), 648 So.2d 411, writ denied, 95-0409 (La. 4/28/95), 653 So.2d 590. To recover, a plaintiff must show proof to reasonably establish his claim. Weber v. Brignac, 568 So.2d 1129 (La.App. 5th Cir.1990).
The plaintiff argues that the trial court erred in failing to award her damages for lost wages from her job with the Caddo-Bossier Council on Alcoholism.[3] We agree. The testimony of the program director for the council established that the plaintiff received $18 per hour and that she missed work from October 2, 1992 to October 19, 1992. Although the program director testified that Ms. Carter worked an average of 20 hours per week, the plaintiff herself testified that she was only paid for eight hours per week. Therefore, we increase the award for *939 lost wages by $360,[4] for a total of $2,568. The judgment of the trial court will be amended accordingly.

Future Medical Expenses
The defendants assert that the trial court erred in awarding future medical expenses of $5,000 for the surgical removal of the plaintiff's ganglion. They contend that the evidence was insufficient to establish that this pre-existing condition was aggravated by the fall or that surgery would even be necessary.
An award for future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. Nevertheless, awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable costs. Killough v. Bituminous Casualty Corp., 28329 (La.App. 2d Cir. 5/8/96), 674 So.2d 1091. A plaintiff must show that the expenses more probably than not will be incurred. Gray v. Louisiana Downs, 585 So.2d 1238 (La.App. 2d Cir.1991).
Dr. Ferrell was the physician who primarily treated the plaintiff's ganglion. He felt that this pre-existing condition had been aggravated by the fall. However, he admitted that ganglions can be aggravated by other factors, including repetitive motion, and that it is not uncommon for them to swell and change size. Also, he testified that on two separate medical history forms, the plaintiff had responded in the negative to the question "Was an automobile or fall involved [in the medical condition for which she seeking treatment]?" Dr. Ferrell recommended conservative treatment, with future surgery if the symptoms persisted and the ganglion limited her abilities. At trial he conceded that, since he had not examined her recently, he could not say whether surgery was presently indicated. Dr. Ferrell testified that the physician's fee and hospital costs would be about $5,000 to surgically remove the ganglion.
The trial court, after carefully considering all of the facts, concluded that the accident more probably than not aggravated this pre-existing condition. Based upon our thorough review of the record, we cannot find that the trial court was manifestly erroneous in this finding. Consequently, the portion of the trial court judgment awarding future medical expenses of $5,000 is affirmed.

CONCLUSION
The judgment of the trial court is amended to increase the award for lost wages from $2,208 to $2,568. In all other respects, the judgment is affirmed. The plaintiff's awards are reduced by her degree of comparative fault. Costs of this appeal are assessed to the defendants.
The judgment is recast, in relevant part, as follows:
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the damages of JEAN CARTER are hereby fixed as follows:

General damages $25,000.00
Past medical expenses $ 4,298.97
Future medical expenses $ 5,000.00
Lost wages $ 2,568.00
 __________
TOTAL $36,866.97

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of JEAN CARTER and against BROOKSHIRE GROCERY STORE in the full sum of TWENTY-THREE THOUSAND NINE HUNDRED SIXTY-THREE AND 54/100 ($23,963.54) DOLLARS together with legal interest thereon at the legal rate from date of judicial demand until paid in full.
AMENDED, AND, AS AMENDED, AFFIRMED.
NOTES
[1] Her fiancé who picked her up at the store later also testified that the plaintiff's clothing was wet.
[2] We note that a conflict existed between the testimony of the plaintiff and the courtesy clerk as to the path taken by the plaintiff. She testified that she entered the rear aisle from an intersecting store aisle and fell almost immediately; the clerk testified that he saw the plaintiff walking toward him along the rear aisle before falling. Although the trial court did not specifically resolve this issue in its opinion, its apportionment of fault leads us to believe that it accorded greater weight to the plaintiff's testimony; had it found the clerk's testimony more credible, a degree of fault higher than 35% would have been appropriate for the plaintiff.
[3] In brief, the plaintiff states that she does not dispute the trial court's refusal to award lost wages for her "on-call" time for this job. Instead, she requests lost wages for the time she would have actually worked.
[4] We compute this amount at $18 per hour for eight hours per week for a period of two and one-half weeks.