823 So.2d 1124 (2002)
Billie HARRISON and Earnest Harrison, Plaintiffs-Appellants
v.
HORSESHOE ENTERTAINMENT, A Louisiana Partnership, Defendant-Appellee.
No. 36,294-CA.
Court of Appeal of Louisiana, Second Circuit.
August 14, 2002.
*1125 Klotz, Simmons & Brainard, by Eron J. Brainard, Shreveport, for Appellants.
Rountree, Cox, Guin & Achee, by Dale G. Cox, Shreveport, for Appellee.
Before NORRIS, STEWART and KOSTELKA, JJ.
STEWART, J.
The plaintiff, Billie Harrison, filed suit for damages against Horseshoe Entertainment, a Louisiana Partnership, the defendant herein, after she sustained injury to her right knee when she slipped and fell in the ladies restroom located on the main gaming floor of the King of the Red riverboat casino. The jury found that the condition of the ladies restroom did not present an unreasonable risk of harm that was reasonably foreseeable. Harrison challenges this finding on appeal. We find no error in the jury's verdict and affirm the judgment of the trial court dismissing Harrison's claim.

FACTS
Billie Harrison and her sister, Dorris Kinnemore, traveled from Texas to spend a few days at the defendant's entertainment and gaming complex while their husbands went on a fishing trip. The sisters had received complimentary hotel passes for two nights and paid for an additional night at the defendant's hotel. The date of the incident, September 17, 1998, was the last day of their visit. After packing their belongings and loading them into Harrison's van in preparation for their trip home, the sisters went to the defendant's casino to enjoy some gaming activities until lunchtime. Harrison and Kinnemore played on different floors of the casino. Harrison went to the main gaming floor to play table games. Sometime after 11:00 a.m., Harrison left the gaming table to go to the ladies restroom. Harrison explained at trial that her turn to throw the dice had passed and that she left for the ladies room before her turn came up again. While on her way to the restroom, Harrison stopped at the roulette table where she won a chip. Harrison then proceeded to the ladies restroom.
Evidence introduced at trial shows that a patron entering the ladies restroom where the accident occurred must pull the door open to gain entrance into the room. The door of a utility closet located in the restroom faces the entrance. Immediately to the right upon entry is a corridor with counters and sinks on the left side and stalls on the right side. As such, a patron enters and turns to the right. The restroom has a tile floor.
As Harrison entered the restroom and turned to the right, she started sliding after taking two or three steps and fell to the ground. She testified that her feet went airborne and that her right knee came down and hit the floor hard. Harrison came to rest on her back with her hands behind her at a location in the middle of the floor between the sinks and the stalls. According to Harrison, the floor was wet, slick, and shiny as though it had just been mopped. Harrison testified that she did not see any signs warning of a wet floor before her fall, but once on the floor, she did see a warning sign folded against *1126 the wall by the sink. The sign was located to the left of her head. There were two ladies in uniform who appeared to be cleaning. One of the ladies left to get help and the other assisted Harrison.
Kinnemore joined Harrison in the restroom after being notified of the accident. An emergency medical technician responded to the scene, assessed Harrison's condition, and transported Harrison by wheelchair to a first aid room where her knee was photographed and ice was applied to the injury. Harrison requested an ambulance which transported her to Bossier Medical Center where x-rays were taken and medication prescribed. The defendant provided transportation for Harrison and her sister from the emergency room back to their own vehicle. Harrison required assistance to get into her van and was unable to drive home. Kinnemore drove the van back to Texas, where she took Harrison directly to another emergency room at a hospital in Tyler where she received medication for pain and inflammation. Harrison's knee injury eventually required surgery.
At the jury trial which ensued, Kinnemore testified that after she was notified of her sister's accident, she proceeded to the restroom where she came upon Harrison lying on the floor and crying. Two other Horseshoe employees were in the restroom along with an emergency medical technician ("EMT"), who was helping Harrison. When Kinnemore knelt beside Harrison, she noticed that the floor was damp and appeared as though it had just been mopped. Kinnemore then noticed a wet floor warning sign folded and propped against the wall. She had not seen a warning sign when she entered the restroom. Kinnemore testified that while she was kneeling beside Harrison, she heard someone say, "Put up the floor sign."
Carolyn Kennedy Gipson was employed by Horseshoe as an environmental services ("EVS") worker at the time of Harrison's accident and was in the restroom standing by the mirror when the accident occurred. Gipson did not see Harrison fall. She heard a lady yell out and then saw Harrison on the floor. Gipson's recall of that day was sketchy at best. For instance, she did not recall the exact reason why she was in the restroom, the time of day when the accident occurred, or the position of the floor sign after Harrison's fall. However, Gipson was adamant that a wet floor warning sign was in position facing the doorway prior to Harrison's entry into the restroom. On cross examination, Horseshoe referred Gipson to her deposition testimony stating that she saw Harrison lying on the floor against the warning sign and that she moved the sign away from Harrison. Gipson agreed that she probably stated that at her deposition.
Wanda Moore was the EMT on duty at Horseshoe when the accident occurred. Moore was called to the restroom where she found Harrison on the floor and the warning sign face down between the utility closet and the first sink near Harrison between her head and feet. Moore's testimony was somewhat contradictory in that she testified both that the sign was face up and face down. However, the sign introduced into evidence has written warnings on both sides. Moore did not know whether there was a second wet floor warning sign in the restroom, and she denied seeing the wet floor sign folded and propped against a recessed area of wall near the sinks. Moore noticed that the floor was dry at the entrance to the restroom, but wet in the area around Harrison. An accident report completed by Moore states that the floor was wet and that the wet floor sign was in place.
*1127 Dorothy Pearce was also an EVS employee at Horseshoe at the time of Harrison's accident. Pearce did not witness the accident. She heard about it while she was at lunch that day. As indicated by the "We Care" card used by Horseshoe to track cleaning activities, Pearce was the employee who had mopped the restroom floor at about 11:00 a.m., prior to Harrison's fall. Employees were required to initial both the front and back of the "We Care" card each time they performed cleaning activities in the assigned area. The front of the card includes a listing of times in thirty minute increments over a twenty-four hour period. Pearce's initials are written next to the 11:00 a.m. time slot along with the notation "mp" which refers to mopping. Employees were also required to initial the back of the card and write the exact time showing when they finished an assigned duty. The back of the "We Care" card has Pearce's initials and the time of 11:12 a.m., which reflects the time the floor was mopped. Pearce explained that she worked the 7:00 a.m. to 3:00 p.m., shift that day and that she took a thirty minute lunch break at 11:30 a.m., during which time Carolyn Gipson covered the restroom. Pearce testified that she was assigned to work in the restroom where the accident occurred for the duration of her shift and that she was required to clean the walls, toilets, sinks, mirrors, and floor. Pearce explained that mopping was done to both clean and disinfect the floors. The mop was wrung out until damp and then moved across the floor so that no puddle or stream of water was left on the floor. Pearce testified that she placed the wet floor caution sign out as instructed when she mopped and that it was placed so that anyone entering could read it. Pearce recalled that there were usually two wet floor caution signs in the utility closet in the restroom and that they were required to put out both signsone near the entrance and one in the rear of the restroom. Pearce's testimony does not indicate whether the rear wet floor sign was in place.
Pearce's testimony regarding the use of the "We Care" card and the cleaning procedures followed in the restroom was corroborated by the testimony of two other Horseshoe employees. Byron Clouatre, an EVS manager, explained the regular training of EVS employees which includes the initial training, monthly training recaps, quarterly department meetings, and written materials on cleaning, including how to damp mop. Clouatre admitted that employees do not always follow instructions. According to Clouatre, restrooms are cleaned from top to bottom, with floors mopped last. The placement of two wet floor signs inside the restroom is required when mopping. The first is placed facing the entrance and is on the floor near the wall where the sink counters are located. The second is placed at the far end of the restroom facing the entrance. Clouatre admitted that he has considered placing additional warning signs either on the entrance door or the utility closet door. Clouatre explained that the restrooms are manned twenty-four hours a day by EVS employees and that no longer than fifteen minutes elapse without either an EVS employee or manager present. On the busiest days, which are Thursdays through Sundays, an EVS worker is assigned to each restroom and another worker covers the restroom during breaks. Moreover, the restrooms are continually inspected throughout the day.
Rose Becknell was the team leader supervising the EVS workers in the restroom on the day the accident occurred. Becknell's initials appear on the front of the "We Care" card beside the times she inspected the restroom and her signature appears on the back of the card. Becknell *1128 also testified about the training of EVS workers, the inspection system, and the required placement of the wet floor warning signs. She explained that warning signs are not placed outside of the restroom because the sign would pose a tripping hazard and block the restroom entrance. She believed that one worker was assigned to maintain cleanliness in the restroom on the day the accident occurred, which was a Thursday, and that the times marked on the "We Care" card showed that the restroom was fully maintained throughout the day.
At the close of all of the evidence, which included other testimony relative to Harrison's injury and treatment, the jury by a vote of ten to two answered "NO" to the following question on the jury verdict form:
1. Do you find that on September 17, 1998 the condition of the ladies room at Horseshoe Entertainment presented an unreasonable risk of harm to Billie Harrison and that this risk of harm was reasonably foreseeable?
Judgment was rendered in accordance with the jury's verdict. Following the denial of her motion for judgment notwithstanding the verdict and/or new trial, Harrison filed the instant appeal challenging the jury's decision.

DISCUSSION
The law which governs negligence claims brought against merchants resulting from accidents caused by a condition existing on or in the merchant's premises is La. R.S. 9:2800.6, which provides in pertinent part as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
(3) The merchant failed to exercise reasonable care.
Failure to prove any of the requirements enumerated in La. R.S. 9:2800.6 will prove fatal to the plaintiff's case. White v. Wal-Mart Stores, Inc., 97-0393 (La.9/9/97), 699 So.2d 1081; Hardman v. Kroger Company, 34,250 (La.App.2d Cir.12/6/00), 775 So.2d 1093.
Merchants are required to exercise reasonable care to protect those who enter the establishment, to keep the premises safe from unreasonable risks of harm, and to warn persons of known dangers. Turner v. Brookshire Grocery Company, 34,562 (La.App.2d Cir.4/4/01), 785 So.2d 161; Hardman v. Kroger Company, supra; Ward v. ITT Specialty Risk Services, Inc., 31,990 (La.App.2d Cir.6/16/99), 739 So.2d 251, writ denied, 99-2690 (La.11/24/99), 750 So.2d 987. Although the owner of a commercial establishment has an affirmative duty to keep the premises in a safe condition, he is not the insurer of the safety of his patrons. Turner v. Brookshire Grocery Company, supra. A *1129 store owner is not liable every time an accident happens. Turner v. Brookshire Grocery Company, supra; Hardman v. Kroger Company, supra.
As indicated on the jury verdict form, the jury concluded that the condition of the ladies restroom did not present an unreasonable risk of harm to Harrison and that the risk of harm was not reasonably foreseeable. A hazardous condition is one which creates an unreasonable risk of harm to customers under the circumstances. In the context of slip and fall cases, a hazard is shown to exist when the fall results from a foreign substance on the floor or from an otherwise unreasonably slippery condition. Ward v. ITT Specialty Risk Services, Inc., supra; Stockwell v. Great Atlantic & Pacific Tea Company, 583 So.2d 1186 (La.App. 1st Cir.1991). The determination of whether a condition presents an unreasonable risk of harm is subject to the manifest error standard of review. We must uphold the fact-finder's determination if we are convinced from a review of the entirety of the record that there is a reasonable basis for the determination. Ward v. ITT Specialty Risk Services, Inc., supra. The findings and credibility determinations made by the fact finder are entitled to great weight and will not be disturbed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
There is no dispute that the floor of the ladies restroom had been mopped sometime prior to Harrison's entry into the restroom and fall. Floors wet from mopping have been found to create unreasonable risks of harm that are reasonably foreseeable in Carter v. Brookshire Grocery Co., 29,166 (La.App.2d Cir.2/26/97), 690 So.2d 933, writ denied, 97-0782 (La.5/01/97), 693 So.2d 734; Knower v. Peranio, 96-105 (La.App. 5th Cir.7/1/96), 678 So.2d 574, writ denied, 96-2004 (La.11/8/96), 683 So.2d 270; and Sampson v. Lemoine, 94-1568 (La.App. 3rd Cir.5/3/95), 657 So.2d 181. In Knower, supra, the defendant used a slippery solution containing laundry detergent and bleach to clean the concrete surface of a service station. The solution looked like water, which is normally found at service stations, and the slick area was not blocked off. In Sampson, supra, the plaintiff slipped and fell upon entry into a grocery store approximately fifteen or thirty minutes prior to closing time. Employees had just finished mopping the entrance area. However, the jury found that the store exercised reasonable care in its mopping operations and denied recovery. In Carter, the plaintiff fell near the dairy case when she left the check out line to retrieve an item she had forgotten. The area near the dairy case had been mopped about thirty minutes prior to plaintiff's accident as part of the normal evening clean-up procedure. The trial court's finding that mopping during business hours created an unreasonable risk of harm was affirmed on appeal. These cases, however, do not establish that a floor wet from mopping is negligence per se or always creates an unreasonable risk of harm.
In the case sub judice, the jury apparently concluded that the condition of the ladies restroom was not a hazardous condition that created an unreasonable risk of harm under the circumstances of this case. What seems to be implicit in the findings that the wet floor presented a hazardous condition in the Sampson and Carter cases cited above is that the defendant's employees mopped the floor during operating hours when they could have waited until closing. However, the defendant's premises operates twenty-four hours a day without closing. The restrooms are manned with EVS employees throughout the twenty-four hour period, and one EVS *1130 worker is assigned to each bathroom during the busiest days, Thursdays through Sundays. The accident occurred on a Thursday. The jury could have balanced the risk posed to patrons by mopping the floor of the restroom against the need to continually maintain cleanliness and sanitary conditions in the restroom. On the basis of such considerations, the jury could have concluded that the condition of the floor after mopping was not hazardous and did not pose an unreasonable risk of harm that was reasonably foreseeable. The restroom where the accident occurred was the only ladies restroom on that gaming floor, thus the jury could have concluded that it would not have been reasonable to close the restroom for mopping and bar the access of female patron's to restroom facilities on that floor. In addition, there was no showing that the cleaning solution used to mop and disinfect the floor created a slippery condition as in the Knower case.
The defendant maintained rigorous procedures for cleaning the restrooms and inspecting the condition of the restrooms on a regular basis. Based on the accident report and the testimony of Wanda Moore, Carolyn Gipson, and Dorothy Pearce, the jury could have concluded that the EVS employees adequately followed the cleaning procedures and that the warning sign was in proper place in the restroom near the entrance where it was visible to patrons upon entry. Such a credibility determination is subject to great deference on appeal.
The issue to be resolved on appeal is not whether the trier of fact was right or wrong, but whether its conclusion was a reasonable one. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). We do not have the benefit of the jury's deliberation or reasons supporting its determination, and we are aware that reasonable persons might have weighed the evidence differently. However, the jury in this matter assessed the testimony presented, evaluated the credibility of the witnesses, and found in favor of the defendant. After reviewing the entirety of the record, we cannot conclude that the jury's findings were manifestly erroneous or clearly wrong.

CONCLUSION
For the reasons mentioned, we affirm the trial court's judgment at appellant's costs.
AFFIRMED.